**GOLD COAST PUBLICATIONS, INC., a Florida corporation d/b/a Exito!, Plaintiff,**

v.

**George M. CORRIGAN, James Barker, et al., Defendants.**

**No. 92–0826–CIV.**

United States District Court, S.D. Florida.

July 9, 1992.

---

Ray Ferrero, Jr., Fort Lauderdale, Fla., for plaintiff Exito.

Sanford L. Bohrer, Miami, Fla., for intervenor New Times.

Charles K. George, Coral Gables, Fla., for defendants.

## ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

MORENO, District Judge.

This case arises from a dispute over the regulation of newsracks in the city of Coral Gables, Florida. After city officials seized its newsracks, Gold Coast Publications, as publisher of a new tabloid newspaper, *Exito*, filed suit against the city of Coral Gables and its officials, alleging that the city's ordinance regulating newspaper racks is facially unconstitutional.[1]

The ordinance requires uniform color, size and design for the racks. It also provides that the newsracks must have pedestals and be secured to the sidewalk. Additionally, the ordinance contains limits as to the size of the lettering on the sides of the newsracks and their location on the public right of way.[2] The plaintiff further claims that the requirements of rack uniformity violate its trademark *Exito*, with its unique purple and green colors.

The city and its officials maintain that the Coral Gables newsrack regulations do

[1] Another tabloid-style newspaper, *New Times*, was permitted to intervene and support plaintiff's challenge to the ordinance. *New Times* is currently attacking the ordinance in a separate action in state court.

[2] On March 31, 1992 the City amended previous ordinance No. 2911. The new ordinance, No. 2984, deleted regulation of newsracks on private property and allowed modifications for tabloid-style newspapers. The ordinance continues to call for gloss brown pedestals, along with gloss beige sides and doors. Only the name of the newspaper is allowed on the side of the rack in letters no larger that 1¾ inches. Both ordinances will be referred to throughout the text of this opinion. The full texts of the ordinances are attached.

not regulate the content or any other speech aspect of newspapers, but simply the racks used for distribution. The city claims that the regulations are permissible time, place or manner regulations that serve the safety and aesthetic interests of its citizens.

There is no dispute that safety and aesthetics are significant governmental interests. Thus, the court's inquiry revolves around whether the ordinance is narrowly tailored to serve those interests and the availability of alternative channels of communication. The court finds that, with the exception of the regulations on color of the racks, size of the lettering, and the use of the term "equivalent", the ordinance is constitutionally valid. Those sections are stricken and severed as unconstitutional. If the Coral Gables city commission passes a new ordinance, the court is confident that it will consider the words of Thomas Jefferson:

> The basis of our government being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter.[3]

### FINDINGS OF FACT

The court held an evidentiary hearing on plaintiff's request for declaratory and preliminary injunctive relief, pursuant to 28 U.S.C. § 2201 and Rule 65, Fed.R.Civ.P., over a period of several days. At this hearing, both sides presented several witnesses.

Edward McHale, a trademark attorney, provided uncontroverted testimony as to the ability of Exito to obtain federal trademark protection for its three dimensional logo and design. Exhibits were introduced showing Exito's application for federal trademarks.

Alfredo Duran, the publisher of Exito, testified that the type of audience targeted by Exito included young upwardly mobile Hispanics, constituting a large cross-section of the Coral Gables population. Duran further testified as to the marketing purpose for the unique design and color of Exito. He also opined that the required beige rack gives the impression of a bland publication. The Court finds this testimony credible.

There is also no question that Exito is not available through home subscription or delivery, and that its only form of distribution is through the newsracks. The Court also accepts the testimony that Exito's circulation substantially increased in Coral Gables when its six racks were confiscated. The Court further finds that Exito's newsracks, by their trademark dress and color scheme, cause the publication to stand out from the rest.

James Bustraan, an executive in charge of circulation and distribution for Exito, described the seized newsracks as ones constructed to accommodate tabloid-style newspapers. He further testified that concrete blocks on the inside bottom of the racks would avoid tippage and prevent injury. He conceded that vandals could move the racks, but testified that it is important for a new publication to have the ability to move racks frequently from one location to another in order to increase circulation.

George Kingsbury, the Coral Gables newsrack project manager, provided a history of the ordinances. He stated that Coral Gables is known as the "City Beautiful" for its constant concern for safety and aesthetics. He reiterated that those interests moved the city commission to pass the challenged ordinance.

Kingsbury reasoned that the bolting of newsracks to the sidewalks prevented their movement by vandals or weather conditions. He testified that the limits on rack location, improved unimpeded ingress and egress from buildings, widened access for handicapped persons' mobility and prevented any other blockage of pedestrian traffic. Kingsbury noted a possible greater safety concern for unmarked crosswalks, due to a higher degree of straying by pedestrians in

3. Letter from Thomas Jefferson to Colonel Edward Carrington (January 16, 1787).

those unmarked crosswalks as opposed to marked crosswalks.[4]

Kingsbury was also recalled by the City to provide testimony and conduct a demonstration as to the adaptability of a seized *Exito* newsrack into one mounted on a pedestal. The demonstration revealed that the confiscated newsrack could be conformed to the requirements of the ordinance, yet continue to allow for tabloid-style newspapers.

Ewell Johnson, Fort Lauderdale Sun Sentinel's chief of circulation, was called by *Exito* to demonstrate the costly burdens of modifying existing *Exito* racks into ordinance-conforming pedestal mounts. Donald Saxon, a Caspar Wireworks Sho-rack employee, provided a fuller explanation of these costs.

The city's witnesses included Maria Albero, a project engineer for the Public Works Department, who testified as to the manner of collecting and handling of newsrack licensing fees.

The Coral Gables city attorney, Robert Zahner, delineated the safety and aesthetics concerns shared by the various entities of the city including the Public Works Department, Zoning Board and the Architectural Board. Zahner provided a brief history of the challenged ordinance. He also explained the distinct functions of the various city departments and boards.

City planning director Diana Wheeler narrated descriptively the city's aesthetic and safety reasons for the establishment of the newsrack ordinance. The court accepts as credible the entire testimony of these three Coral Gables city employees.

Alan Richman, the code enforcement officer who is named as a defendant along with the City and its commissioners, testified that he picked up six newsracks. He clarified that none were taken from private property.

The two intervenor witnesses credibly testified as to the negative effect on circulation caused by the forced use of generic newsracks.

### CONCLUSIONS OF LAW

*Prerequisites to injunctive relief*

Rule 65 of the Federal Rules of Civil Procedure authorizes the district court to grant preliminary injunctive relief at its discretion. *United States v. Lambert*, 695 F.2d 536 (11th Cir.1983); *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir.1981).

In exercising its discretion, the court must consider and balance the four recognized prerequisites to preliminary injunctive relief as enunciated by the Eleventh Circuit Court of Appeals: (1) a substantial likelihood that the movant will prevail on the underlying merits of the case, (2) a substantial threat that the moving party will suffer irreparable damage if relief is denied, (3) a finding that the threatened injury to the movant outweighs the harm the injunction may cause defendant, and (4) a finding illustrating the extent to which granting the preliminary injunction will disserve the public interest. *Lucero v. Operation Rescue*, 954 F.2d 624 (11th Cir.1992); *Tally–Ho, Inc. v. Coast Community College District*, 889 F.2d 1018 (11th Cir.1989).

The plaintiffs have the burden of persuasion on *all* four preliminary injunctive standards. *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir.1983). The court is always guided by the underlying premise that "a preliminary injunction is an extraordinary and drastic remedy." *Canal Authority v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974). In the free speech context, the questions of irreparable harm and likelihood of success on the merits are necessarily subsumed into a First Amendment inquiry. *Gannett Satellite Information Network, Inc. v. Township of Pennsauken*, 709 F.Supp. 530 (D.N.J.1989).

---

**4.** Section 22–166 of the ordinance proscribes newsrack locations within five feet of a marked crosswalk and within ten feet of an unmarked one. It also prohibits installation of the racks within ten feet of a fire hydrant, five feet of a driveway, five feet ahead and fifteen feet behind a bus stop, two feet of a bus bench, two feet of parking meters, street lights, utility poles, three feet of a display window, and five feet of a building entrance.

If the City of Coral Gables is abridging First Amendment rights, *Exito* is likely to succeed on the merits. Additionally, it is well-settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir.1983). If the ordinance violates the First Amendment rights of *Exito* and the public, the balance of equities will not rescue the defendants. Therefore, the issuance of a preliminary injunction in the context of free speech turns solely on whether the challenged ordinance violates the First Amendment.

### Prior restraint and procedural due process

Initially, this Court must decide whether it is appropriate for *Exito* to challenge the newsrack ordinance on its face. The court acknowledges that the law does not generally favor facial attacks on the validity of ordinances, but prefers to review their constitutionality as applied to individual litigants. *See Sentinel Communications Co. v. Watts*, 936 F.2d 1189 (11th Cir.1991). The United States Supreme Court recently addressed the issue of facial constitutional challenges in the context of the First Amendment and a local government newsrack ordinance. *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).

In *Lakewood*, the newspaper alleged that a local ordinance was facially unconstitutional because it gave a government official unfettered discretion over whether to permit or deny expressive activity. The Supreme Court referred to a long line of cases holding that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially, without the necessity of first applying for, and being denied a license. *Id.* at 755–56, 108 S.Ct. at 2142–43.[5]

Several policy considerations governed the *Lakewood* Court's fashioning of a two-part test in determining the appropriateness of a facial constitutional challenge. First, in the arena of freedom of speech, a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship. *Shuttlesworth*, 394 U.S. at 151, 89 S.Ct. at 938–39; *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Second, the mere existence of a licensor's unfettered discretion, when added to the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused. *Lakewood*, 486 U.S. at 757, 108 S.Ct. at 2144.

Finally, if the ordinance does not contain express standards, the court's task in distinguishing, "as applied", between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power becomes nearly impossible. *See id.* Marshaling these policy concerns, the *Lakewood* Court established a two-part test to ascertain the appropriateness of a facial challenge.

The Court held that a plaintiff may challenge a licensing ordinance facially whenever (1) it gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers, and (2) it has a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks. *Id.* 486 U.S. at 760, 108 S.Ct. at 2145.

Applying this test, the *Lakewood* Court permitted a facial challenge in view of the combination of two factors. The City of Lakewood ordinance required the newspaper to apply annually for newsrack licenses. This multiple or periodic licensing requirement allowed the licensor substantial power to discriminate on the content or viewpoint of speech, by reviewing speech uttered under previously approved licenses,

---

**5.** *See, e.g., Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

prior to issuing the next license. Additionally, the licensing system at issue in *Lakewood* was directed narrowly and specifically at the circulation of newspapers, which is expression or conduct commonly associated with expression.

In *Sentinel Communications Co. v. Watts*, 936 F.2d 1189 (11th Cir.1991), a newspaper company challenged an essentially standardless licensing scheme for regulation of newsracks at Florida interstate rest areas. The Eleventh Circuit, in reversing the district court, concluded that the regulatory ordinance appeared to be facially infirm in putting completely standardless and unfettered discretion for issuing newsrack licenses into the hands of one Tallahassee bureaucrat.

■ Applying the *Lakewood* test for facial challenges to the Coral Gables ordinance, this court is convinced that *Exito*'s facial challenge is justified. Similar to the Lakewood ordinance, the Coral Gables ordinance contains a multiple or periodic licensing requirement. In particular, section 22–159(c) of Ordinance No. 2984 provides:

> If at any time after initial application for an installation certificate of compliance a publisher wishes to install additional newsracks, then subsections (c), Applications, and (d), Procedure, above are to be repeated in accordance with the provisions of this article.[6]

Accepting as true *Exito*'s assertion that young newspapers need to use a trial and error method to identify the prime locations for distribution of newspapers by newsracks, it would appear that the additional certificate of compliance requirement in Section 22–159(c) is not only multiple, but also periodic.

The City of Coral Gables gives government officials "substantial power to discriminate based on the content or viewpoint of speech", because they may review speech already uttered under previously issued newsrack licenses in considering whether to issue certificates of compliance for additional newsracks. Moreover, it is clear that this law is directed narrowly and specifically at conduct commonly associated with expression: the distribution and circulation of newspapers by newsrack. *See Lakewood,* 486 U.S. at 760, 108 S.Ct. at 2145. *Exito*'s facial constitutional challenge to the Coral Gables newsrack ordinance is warranted under the policy considerations and two-part test enunciated in *Lakewood* and followed in *Watts.*[7]

### Prior restraint and the term "equivalent"

Deciding that *Exito* has standing to raise a facial constitutional challenge does not end the prior restraint inquiry. *Exito* primarily contends that the ordinance operates as an unconstitutional prior restraint by using the term "equivalent" in the section controlling installation and maintenance of newsracks.[8] *Exito* argues that constitutionally impermissible discretion is vested through the term "equivalent", since the ordinance is unclear as to who decides what constitutes an "equivalent" newsrack, and is also void of the standards to be applied in determining "equivalent" status.

■ A law that subjects the exercise of First Amendment freedoms to the prior restraint of a license; without narrow, objective and definite standards to guide the licensing authority, is unconstitutional. *Shuttlesworth v. City of Birmingham,* 394

---

6. The interpretation of this provision as a multiple licensing requirement is consistent with the provision in Section 22–158 which mandates a one-time only certificate of compliance for each newsrack installed.

7. An "as applied" challenge may be appropriate here as well, since the parties stipulated that had *Exito* and intervenor *New Times* applied for a permit under the March 31, 1992 revised ordinance No. 2984 with their current newsrack, the application would have been denied.

8. Newsracks shall be single pedestal TK–80PM or K–80PM SHORACK with special pedestal mount and fourteen inch (14″) square base plate (mandated) or TK–80 or K–80 SHORACK with special pedestal and fourteen inch (14″) square base plate (allowed only if demand warrants at the installation location) or *equivalent.* § 22–164(a).

U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Any licensing system which operates as a prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman v. Maryland*, 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965); *Miami Herald Pub. Co. v. City of Hallandale*, 734 F.2d 666 (11th Cir.1984).

█ It is apparent from a review of the ordinance, facts and testimony at the hearing, that the term "equivalent" violates prior restraint proscriptions of the First Amendment. First, it is uncertain who decides what constitutes an equivalent newsrack. George Kingsbury, Coral Gables newsrack project manager, testified that some person or group of persons from the Department of Public Works makes the decision. Additionally, Kingsbury speculated that outside consulting services may be used.

The language of the ordinance itself suggests that perhaps only the Public Works Director makes the decision. Section 22–159(b) states that "[t]he Public Works Director shall provide ... review and approval only as to compliance with ... Sec. 22–164, Installation and Maintenance." If only the Public Works Director decides what constitutes an equivalent, then the term impermissibly vests standardless discretion in one official, like the unguided bureaucrat in *Watts*.

Second, the language in the ordinance that the city believes provides narrow, definite and objective standards for determining an equivalent newsrack only compounds the confusion and leaves the decisionmakers to their own discretion. A newspaper publisher attempting to comply with the ordinance is confronted with the definition of "equivalent" newsrack as "any newsrack which is of the same size, dimensions and style of the specified news-

rack." § 22–156(c).[9] Section 22–159(c)(5) specifies that a written application for an installation certificate of compliance must contain the type or brand of newsrack, including an illustration and description of the newsrack and mount if other than a single pedestal TK–80PM SHORACK or modified rack for vertically-formatted newspapers under Section 22–164(c).

*Exito* desires to use a Caspar 33CT brand newsrack which measures 49″ in height, 16″ in width and 20″ in depth. The TK–80 SHORACK specified in Sections 22–159(c) and 22–164(c) measures 48⅝″ in height, 19¼″ in width and 16¼″ in depth. Under the definition in Section 22–156(c), *Exito*'s newsrack cannot possibly constitute an "equivalent" since it is unequal in size to the specified TK–80PM rack. Yet the application provision in Section 22–159(c) seems to indicate that racks other than the specified TK–80PM or modified TK–80PM [10] will be permitted, presumably under the term "equivalent".

It is logically impossible for the TK–80PM rack specified in Section 22–164(c) to simultaneously be modified to accommodate vertically-formatted newspapers under the provisions of that section, and satisfy the definition of equivalent as being the same size, dimensions and style of the TK–80PM rack. Furthermore, the court accepts as true *Exito*'s demonstration of the difficulty inherent in attempting to display vertically formatted tabloid-type newspapers in the TK–80 rack which more readily accommodates horizontally-formatted newspapers.

Kingsbury's testimony only further clouded the issue of "equivalent" newsracks. At first, he testified that *Exito*'s Caspar 33CT newsrack did not have the pedestal required of the TK–80 rack, but had the potential of being an "equivalent" newsrack in other respects. He neither clarified what those other respects might

**9.** This definition is nearly the same as the one provided by Black. Equivalent means "[e]qual in value, force, measure, volume, power and effect or having equal or corresponding import, meaning or significance." *Black's Law Dictionary* 486 (5th ed. 1979).

**10.** Under Section 22–164(c), [m]anufactured modifications to the door, window and cabinetry for the above described [TK–80PM or "equivalent"] newsracks to accommodate vertically-formatted, "tabloid-type" newspaper display and distribution are acceptable.

be, nor pointed out where they might be located in the ordinance.

Later in his testimony, the city introduced one of *Exito*'s confiscated Caspar 33CT newsracks, painted beige and affixed with a pedestal mount, and Kingsbury testified that this modified rack would be an "equivalent" under the ordinance. Utilizing the only standard present in the ordinance for determining "equivalent", the definition in Section 22–156(c), the court fails to see how the modified Caspar 33CT rack is of the same size, style and dimensions as the specified TK–80 rack.

A practical illustration will serve to demonstrate how the term "equivalent" operates as an unconstitutional prior restraint by impermissibly vesting standardless discretion in whomever ultimately issues the newsrack license. A Coral Gables city official, unhappy with a recent issue of *Exito*, where a writer criticizes a Coral Gables taxation plan, may deny additional certificates of compliance on the grounds that the newsrack is not an "equivalent". When pressed for a rationale, the official can only point to the definition of "equivalent" in Section 22–156(c).

The inability of the licensor to delineate the express standards in the ordinance used in arriving at the decision of what constitutes an "equivalent", makes it impossible for the court to determine whether the licensor is legitimately denying a certificate or illegitimately censoring speech based on its content. *See Lakewood*, 486 U.S. at 758, 108 S.Ct. at 2144. In order for the term "equivalent" to meet constitutional standards in this context, the ordinance must contain a section outlining solely the standards guiding the licensor's determination of "equivalent". Then, and only then, would a court be able to discover whether the denial satisfies the dictates of the First Amendment. If not, the licensor will succeed in masking unconstitutional restrictions on protected speech by using two seemingly meaningless words: not equivalent.

This scenario is especially forceful here. The city's notice of violation merely informed *Exito* that it was in violation of Chapter 28, Article VI of the city code by "[m]aintaining one or more newsracks on public rights-of-way which are not in compliance with Chapter 28, Article VI." The notice does not indicate any specific violations of particular sections. It merely makes a blanket general statement that *Exito*'s newsracks are not up to par with the city code. It might just as easily have said, "Your newsracks are not equivalent". Stated either way, the notice is insufficient to satisfy the demands of procedural due process to which *Exito* is entitled.

It is not necessary for the court to rule on *Exito*'s contention that the ordinance's provision for local or judicial review is constitutionally insufficient. Section 22–162 provides that an applicant who has been denied a certificate may file an appeal to the city commission, which will be heard within 30 days of the filing of the appeal or at the next regularly scheduled agenda, whichever is sooner. *Exito* complains that this section violates its right to procedural due process, since it fails to set forth a time frame in which the city must render a decision on appeal.

Since the court finds that the ordinance's use of the term "equivalent", without designation of a decisionmaker and in the absence of narrow, objective and definite standards to guide the decision, functions as an unconstitutional prior restraint, it need not reach the time delay issue. Even expedited judicial review does not adequately compensate for the lack of concrete standards to guide the decisionmaker's discretion. *Lakewood*, 486 U.S. at 771, 108 S.Ct. at 2151. The term "equivalent" must be stricken from the ordinance. Any other conclusion would take the teeth out of the law of prior restraint and reduce it to insignificant proportions.

### *Severability*

Severability of a local ordinance is a matter of state law. *Mayflower Farms, Inc. v. Ten Eyck*, 297 U.S. 266, 56 S.Ct. 457, 80 L.Ed. 675 (1936). An invalid or unconstitutional section of a statute or municipal regulation is severable from the

statute or regulation as a whole, and the surviving, valid portions are enforceable, if:

the unconstitutional portion of the ordinance can be eliminated without doing violence to the legislative purpose expressed in the valid portion, if the remaining portion is complete in itself and if the valid and invalid portions are not so inseparable that one portion would not have been enacted without the other.

*Gates v. City of Sanford,* 566 So.2d 47 (Fla. 5th DCA), *review dismissed,* 576 So.2d 287 (1990). One of the factors that must be considered in determining whether the valid portions of a statute are "separable" from portions declared invalid is the existence of a severability clause. *Tropical Park, Inc. v. Department of Bus. Reg.,* 433 So.2d 1329 (Fla. 3d DCA1983).

Here the purpose of the ordinance was to promote the public health, safety and welfare through the regulation of placement, type, appearance, servicing and insuring of newsracks on public rights-of-way.[11] That purpose is not affected by the invalidity of the term "equivalent". The invalid portion is easily severable from the valid portions of Sections 22–156 and 22–164(a), and the remaining portions are complete in themselves. Further, the fact that the City of Coral Gables ordinance contains a severability clause in Ordinance No. 2911, Section 28–47, § 4, is evidence that the valid portion would have been enacted even without the equivalence provision. Thus, even though the Court strikes the term "equivalent", the remainder of the ordinance survives and stays in full force and effect.

*Time, place and manner regulations*

▮ *Exito* challenges numerous provisions in the ordinance, contending that they bear no rational relation to health, safety and welfare or are unconstitutionally overbroad. Traditionally, the First Amendment

guarantees of freedom of the press have been extended to the right to distribute newspapers. "Liberty of circulating is an essential to [freedom of the press] as liberty of publishing; indeed without the circulation, the publication would be of little value." *Lovell v. Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) (*quoting In re Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1878)); *see also, News and Sun–Sentinel Co. v. Cox,* 702 F.Supp. 891 (S.D.Fla.1988); *Southern New Jersey Newspapers. Inc. v. Department of Transportation,* 542 F.Supp. 173 (D.N.J.1982). The protection accorded liberty of circulation, flows not only from the newspaper's right of publication, but also from the public's right of access to newspapers. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Philadelphia Newspapers, Inc. v. Borough of Swarthmore,* 381 F.Supp. 228 (E.D.Pa.1974).

▮ Unquestionably, these reciprocal rights of circulation and of access logically confer protection to publishers of the right to distribute newspapers by newsracks. *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Sentinel Communications Co. v. Watts,* 936 F.2d 1189 (11th Cir.1991); *Miami Herald Pub. Co. v. City of Hallandale,* 734 F.2d 666 (11th Cir. 1984).[12] The degree to which the government may regulate communicative activity protected by the First Amendment depends upon the nature of the forum in which the First Amendment rights are sought to be exercised. *Cornelius v. NAACP Legal Defense and Educational Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). In short, the degree of protection provided by the Constitution depends "on the character of the property at issue." *Perry Education Ass'n v. Perry Local Educators'*

---

**11.** Ordinance No. 2911, § 28–38.

**12.** For other cases recognizing that the First Amendment fully protects the right of newspaper publishers to distribute newspapers by newsracks, *see Gannett Satellite Info. Network, Inc. v. Metropolitan Transp. Authority,* 745 F.2d 767, 777 (2d Cir.1984); *Gannett Satellite Info. Network, Inc. v. Township of Pennsauken,* 709

F.Supp. 530, 536 (D.N.J.1989); *Chicago Newspaper Publishers Ass'n v. City of Wheaton,* 697 F.Supp. 1464, 1466 (N.D.Ill.1988); *Providence Journal Co. v. City of Newport,* 665 F.Supp. 107, 110 (D.R.I.1987); *Philadelphia Newspapers, Inc. v. Borough of Swarthmore,* 381 F.Supp. 228, 240 (E.D.Pa.1974).

*Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

■■■■ In this case, the "property at issue" is public rights-of-way in the city of Coral Gables. Public streets, sidewalks, and parks are classic examples of traditional public forums. *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). From ancient times, these traditional public forums have been held open to the public for purposes of speech and debate. *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Indeed, in these traditional public forums, the city's authority to restrict speech is at its minimum. Time, place and manner regulations are valid only if they are content-neutral, narrowly tailored to serve a significant government interest, and retain ample alternative channels of communication. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955.

### Content-based or content-neutral

■■■ Section 28–38(h) of Ordinance No. 2911 declares that one of the purposes of the ordinance is to treat all newspapers equally regardless of their size, content, circulation, or frequency of publication. The restrictions, on their face, apply equally to all newsracks in the public rights-of-way. That is all that is required to demonstrate content-neutrality in a First Amendment context. *See, e.g., Gannett,* 745 F.2d at 773; *Pennsauken,* 709 F.Supp. at 536; *Wheaton,* 697 F.Supp. at 1469; *Providence Journal,* 665 F.Supp. at 112. *Exito*'s broad, sweeping statement that the ordinance is not content-neutral because it treats broadsheet and tabloid media differently in practice, is irrelevant to the content-neutrality inquiry.

### Narrowly tailored to serve significant government interests

■■■ The second prong of the time, place, manner analysis breaks down into two levels. First, the government bears the burden of asserting a significant state interest. *Providence Journal,* 665 F.Supp. at 113. The government must next show

that the regulations in the ordinance are narrowly tailored to serve the asserted significant government interest. The city of Coral Gables newsrack ordinance expressly avers that its primary interests are improvement of pedestrian and traffic safety and enhancement of aesthetics.

### Safety interests

■■■ It is undisputed that the city of Coral Gables may enact time, place and manner regulations on protected speech in a traditional public forum to promote safety interests. *Heffron v. International Soc. for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). The purpose and criteria section at the beginning of the ordinance outlines the general safety interests that it seeks to secure.

The ordinance strives to preserve pedestrian and traffic safety at street corners, improve ingress and egress from buildings, and increase public access to traffic signals and utility poles. Kingsbury, the newsrack project engineer, testified that some of the safety concerns are to avoid blockage of pedestrians in crosswalks or other highly concentrated pedestrian areas, improve ingress and egress from buildings, avoid congesting ramps designed for handicapped individuals and deter blocking of parking areas and emergency vehicles. Kingsbury further testified that the requirement of bolting newsracks[13] to the ground by pedestal discourages vandalism and wards off competing newspapers who might shift the racks.

Throughout its pleadings and at the hearing, *Exito* complained that the ordinance provisions for newsrack placement, mounting, installation, maintenance and specific prohibitions[14] bear no rational relation to health, safety and welfare or are unconstitutionally overbroad. For these place and manner restrictions to be valid, however, they must only be narrowly tailored to serve the expressed safety interests.

---

**13.** Ordinance No. 2984, § 22–164(f).

**14.** Ordinance No. 2984, §§ 22–163 to 22–166.

The city points out that the United States Supreme Court has recently clarified the "narrowly tailored" prong of the *Perry* test in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In *Ward*, the Court rejected the requirement that the particular regulation or provision be the least speech-restrictive alternative. *Id.* at 799, 109 S.Ct. at 2758. The *Ward* Court stated:

> [T]he requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation ... So long as the means chosen are not substantially broader than necessary to achieve the government's interest ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

*Id.* at 799–800, 109 S.Ct. at 2758–59 (citations omitted). The city summarily concludes that their legitimate safety interests would be "served less effectively" in the absence of regulations, therefore the regulations must be valid.

If the city reads *Ward* to mean that the court should automatically defer to a local government's judgment whenever the local government enacts regulation intended to serve what it views as a significant state interest, then the city is mistaken. *Ward* does not stand for the proposition that the court has, in effect, become a ministerial rubber stamp whenever a local government raises the banner of safety or aesthetics.

To be sure, the *Ward* court outlined the proper relationship between the court and the legislature when balancing the concerns of the First Amendment against a local government's legitimate safety interests and the means chosen to effectuate those interests. The *Ward* court certainly concluded that it would be improper for a court to invalidate a regulation, simply because it disagreed with the government over how best to achieve the asserted state interest.

But the *Ward* Court did not remove all analytical power and judicial scrutiny from the process of evaluating the constitutionality of a time, place or manner regulation on protected speech. *Ward* specifically noted that its standard for determining narrowly tailored does not mean that a time, place or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. *Id.* at 799, 109 S.Ct. at 2758. A government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. *Id.* Especially when the First Amendment concerns of freedom of speech and press are at stake, this Court will not be the first to suggest that judicial review has been excised.

With that in mind, the court proceeds to evaluate whether the regulations are narrowly tailored to serve the city's significant interest in pedestrian and traffic safety. If the significant government interest is providing for pedestrian safety, then limitations on (1) the number of newsracks which may be placed in any one area, (2) the location of newsracks in relation to areas of heavy pedestrian traffic, and on (3) the height, depth and length of newsracks, are certainly narrowly tailored.

If the asserted government interest is egress and ingress from buildings, then a limitation on the position of newsracks in relation to structures on the public right-of-way burdens no more speech than is necessary to serve that interest. *Exito* argues that there is no reason to distinguish between marked and unmarked crosswalks. Section 22–166(1) forbids placement of any newsrack within five feet of any marked crosswalk, but (2) prevents placement within ten feet of any unmarked crosswalk.

In fact, *Exito* contends that there should be a greater safety concern with placement near marked crosswalks. Kingsbury testified that the city is more concerned with respect to safety near unmarked crosswalks, since pedestrians tend to stray further when crossing at these intersections. The court will not substitute its judgment for that of an elective body.

Other district courts that have invalidated place and manner restrictions for failing the narrow tailoring requisite, have done so where broadly asserted safety interests are unsubstantiated by the evidence, *Pennsauken*, 709 F.Supp. at 536–37, or where the evidence connecting the regulation to the safety interest is speculative, *Southern New Jersey*, 542 F.Supp. at 186. The evidence linking the regulation to the pedestrian and vehicular safety interests in this case is substantiated and definitive.

Indeed, the narrowly tailored regulations for safety interests in the Coral Gables ordinance are similar to those found constitutional in *Providence Journal Co. v. City of Newport*, 665 F.Supp. 107 (D.R.I.1987). Like the photographs admitted in *Providence Journal*, the photographs here showed newsracks piled up at many intersections and crosswalks. The *Providence Journal* court found that heavy tourist traffic surrounding these stacks of newsracks could cause spillover into the street and lead to significant safety hazards for pedestrians and drivers. The newsrack clusters also reduced available sidewalk space for handicapped pedestrians.

The city of Newport ordered the sidewalks to be completely cleared of all newsracks, and the court decided that this banishment markedly advanced the city's safety interest in unobstructed pedestrian flow. Here, the regulations do not ban all newsracks on the streets and sidewalks, but merely restrict quantity at certain locations and prescribe specific distances from crosswalks and structures. On the evidence admitted, the court finds that the mounting, installation, placement, and maintenance regulations burden no more speech than is necessary to further the city's legitimate safety interests.

### *Aesthetic interests*

■ The city of Coral Gables may also enact valid time, place and manner regulations for newsracks to advance aesthetic interests. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). The ordinance notes that it strives to promote public welfare by "relocating or replacing newsracks which result in a visual blight ... or which unreasonably detract from the aesthetics of store window displays, adjacent landscaping and other improvements."[15] The sections which most directly bear on the enhancement of aesthetics are the regulations of newsrack color and the size of the lettering on the sides of the newsrack.[16]

First, it is important to discuss briefly the test applied when evaluating time, place, or manner regulations that seek to promote aesthetic interests. In *Metromedia*, the Supreme Court recognized the subjective nature of aesthetic judgments, and concluded that lower courts must carefully scrutinize regulations to determine that they are not a "public rationalization of an impermissible purpose." *Metromedia*, 453 U.S. at 510, 101 S.Ct. at 2893. In a concurring opinion, Justice Brennan suggested that, before deferring to a city's judgment, a court must be convinced that the city is seriously and comprehensively addressing aesthetic concerns with respect to its environment. *Id.* at 531, 101 S.Ct. at 2904 (Brennan, J., concurring).

In *Vincent*, the Supreme Court reaffirmed its holding in *Metromedia* that a court should show considerable deference to a city's aesthetic judgments. *Vincent*, 466 U.S. at 807, 104 S.Ct. at 2130. The *Vincent* majority expressly rejected Justice Brennan's position that a court must only defer where the city demonstrates a serious and comprehensive plan concerning aesthetics. *Id.* n. 25.

Once again, however, the Supreme Court has not concluded that lower federal courts become ministerial rubber stamps whenever a local government asserts a significant state interest. *Wheaton*, 697 F.Supp. at

---

**15.** Ordinance No. 2911, § 28–38(e).

**16.** Newsracks on public rights-of-way in Coral Gables must be beige or brown, and the lettering on the sides of the racks may not exceed 1¾" in height. Ordinance No. 2984, § 22–164(b), (c).

1470. The court must determine whether the state interest is sufficiently substantial to justify the effect of the ordinance on plaintiff's expression, and whether the effect is no greater than necessary to accomplish the city's purpose. *Vincent,* 466 U.S. at 805, 104 S.Ct. at 2128–29. Aesthetics has a higher subjective component than safety, but that does not mean that "simply uttering the words aesthetics or appearance should magically alleviate any need for evidence connecting the regulation to the state interest, particularly where fully protected First Amendment interests are at stake." *Southern New Jersey Newspapers,* 542 F.Supp. at 186.

The city reiterated repeatedly that Coral Gables, the City Beautiful, has focused on developing its aesthetic environment since its inception. The city identified the substantive aesthetic evils as "visual blight" and "detractions from aesthetics". The court is not persuaded, however, that requiring newsracks to be a uniform color and restricting the size of lettering on the sides of newsracks are regulations narrowly tailored to serve those goals.

The city cites numerous cases upholding location and size requirements for newsracks and billboards, but no case permitting regulations which impose uniformity of color and restrict the size of lettering to as small as 1¾". Merely referring to a group of newsracks of different colors as "visual blight" does not justify the color and size of lettering restrictions. In *Providence Journal,* the city of Newport showed photographs of dented, rusted and otherwise poorly maintained racks. The photographs admitted here show a multitude of colors, but the newsracks are not in a poor state of repair.

Moreover, regulations mandating uniformity of newsrack color and size of lettering are especially offensive to First Amendment concerns, when the city authorizes a variety of colors and lettering size on other street furniture and architectural projections. The photographs show awnings over buildings in Coral Gables representing a large spectrum of colors. Trash barrels, owned by the city, are multi-colored and the lettering on the sides of these receptacles is not limited to 1¾". The University of Miami may identify its buildings with four-inch lettering on signs while newsracks are limited to 1¾" lettering. The banner of aesthetics, here, can quite possibly be a public rationalization for the impermissible purpose of targeting newsracks.

The city simply has not shown how requiring newsracks to be gloss brown or beige and limiting the size of lettering on the sides of newsracks advances its interest in aesthetics. Uniform color essentially renders the newsracks invisible, which is especially detrimental to new market entries such as *Exito* or *New Times.* Where a newspaper relies largely on its unique coloring and logo scheme to improve its circulation, and the public right of access to newspapers depends on its familiarity with that scheme, restrictions mandating homogeneity of color are not merely incidental, but rather disproportionate restraints on freedom of expression. The effect on *Exito*'s First Amendment freedoms is broader than necessary to serve the city's weighty aesthetic goals, and is thus constitutionally intolerable.

### Ample alternative channels of communication

Even if the city shows that its time, place and manner regulations on newsracks are content-neutral and narrowly tailored to serve a significant interest, it must still show that "ample alternative channels of communication" remain open for the expressive activity. *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753; *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55. The time, place or manner test has three parts and *Perry* lists them in the conjunctive. That is, an ordinance must satisfy all three of the criteria to be constitutionally sufficient. *Providence Journal,* 665 F.Supp. at 117. Thus, the city's assertion that ample alternative channels necessarily exist via narrowly tailored permissible uses is categorically rejected.

 The city argues that ample alternative channels exist because *Exito* and

*New Times* can distribute their newspapers without government interference on private property. Availability from newsracks on private property is irrelevant from a constitutional standpoint. *Swarthmore*, 381 F.Supp. at 242 n. 8. When evaluating the availability of alternative channels, courts must consider the alternative channels left open within the public forum, not ones available on private property. *Providence Journal*, 665 F.Supp. at 118 (*citing Heffron*, 452 U.S. at 654–55, 101 S.Ct. at 2567–68).

With respect to safety interests, the Court finds that ample alternative channels of communication exist. The city has not completely banned newsracks from the public rights-of-way in Coral Gables. As long as *Exito* complies with the reasonable placement and mounting restrictions in the ordinance, it may be amply distributed. It is unnecessary to analyze ample alternative channels with respect to aesthetic interests, since the color and size of lettering restrictions violate the narrow tailoring requirement and are thus constitutionally inadequate.

### Fees, insurance, and trademark rights

It is well established that a licensing fee is permissible, but a state or municipality may charge no more than is necessary to cover administrative costs. *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The government may not profit by imposing licensing or permit fees on the exercise of First Amendment rights. *Sentinel Communications Co. v. Watts*, 936 F.2d 1189 (11th Cir.1991).

The ordinance requires a one-time $50 certificate of compliance fee, $10 per installed newsrack, and a $5 reinspection fee for failed inspections. It also specifies that any funds left over after defraying administrative costs will be returned to newspaper publishers in proportion to their respective contributions.[17] Based on the testimony concerning administrative costs submitted at the hearing, the Court finds that these fees do not represent an uncon-

stitutional tax on First Amendment activity.

The $50 that the city charges for confiscated newsracks, however, is not written into the ordinance. This failure to include a measurable recovery fee raises a suspicion that this fee raises revenue beyond that necessary to administer the provision. The testimony adduced at the hearing did not alleviate, but rather exacerbated suspicion. *Exito* proved to this court's satisfaction that it could not possibly have cost the city $50 to pick up each newsrack.

The requirement that newsracks carry liability insurance is not unconstitutional. The court finds no evidence of the disparate treatment regarding insurance that troubled the court in *Watts*. In *Watts*, the Eleventh Circuit was concerned where uncontroverted evidence suggested that newsracks at interstate rest areas were being forced to carry liability insurance, while other vending machines, such as Coke or Pepsi, were apparently exempt from such a requirement. *Watts*, 936 F.2d at 1207. Differential treatment for the press of this nature would be presumptively unconstitutional. *Minneapolis Star & Tribune Co. v. Commissioner of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). *Exito* has not shown that newsracks on public rights-of-way must insure against liability, while other vendors are exempted.

Finally, it is unnecessary to reach the issue of whether the color and size of lettering regulations violate *Exito*'s rights under the Lanham Act, 15 U.S.C. § 1051 et seq., as the court has already found those to be invalid time, place or manner regulations.

Accordingly, it is

ADJUDGED that *Exito*'s motion for preliminary injunction is GRANTED IN PART and DENIED IN PART.

1. The term "equivalent" functions as an unconstitutional prior restraint, and the city is enjoined from enforcing that provision in Section 22–164(a) of Ordinance No. 2984. Since the term is severable, the re-

---

**17.** Ordinance No. 2911, § 28–46; Ordinance No. 2984, § 22–161.

mainder of that section remains in full force and effect.

2. The regulations concerning mounting, installation, placement and maintenance of newsracks are valid place and manner regulations on First Amendment activity, and the city may enforce these restrictions.

3. The regulations concerning color and size of lettering on the sides of newsracks are invalid place or manner regulations, and the city is enjoined from enforcing those portions of Sections 22–164(b) and (c).

4. The regulations concerning fees in Section 22–161 and insurance in Section 22–160 are constitutional, and the city is free to enforce those provisions.

DONE AND ORDERED.

*Appendix*

## CITY OF CORAL GABLES, FLORIDA

### ORDINANCE NO. 2911

AN ORDINANCE CONSOLIDATING AND REENACTING ALL PREVIOUS ORDINANCES WHICH AMEND THE "CODE OF THE CITY OF CORAL GABLES" BY ESTABLISHING REGULATIONS FOR NEWSRACKS ON PUBLIC RIGHTS–OF–WAY AND IN PARTICULAR AMENDING CHAPTER 17, ENTITLED "LICENSES", AND CHAPTER 28, ENTITLED "STREETS AND SIDEWALKS", FOR THE PURPOSE OF ADDING PROVISIONS FOR "NEWSRACKS ON PUBLIC RIGHTS–OF–WAY"; ESTABLISHING SPECIAL PROCEDURES CERTIFYING THE INSTALLATION, MAINTENANCE AND INSURING OF NEWSRACKS; RESCINDING ORDINANCES NOS.: 2729, 2780, 2865, 2882, 2901 AND 2908; PROVIDING FOR THE SEVERABILITY OF THE PROVISIONS HEREOF; AND REPEALING ALL ORDINANCES INCONSISTENT HEREWITH.

WHEREAS, pursuant to Section 17–30(66)(c)(1)(f) of the "Code of the City of Coral Gables", occupational licensing is required for each newspaper operator and each newspaper vending machine, and

WHEREAS, substantial growth in numbers of newspaper operators and newsracks in the City has produced a significant increase in the number of newsracks installed in public rights-of-way, resulting in complaints by citizens and businesses about certain of these installations, and concern therefor by the public and City officials with regard to the safety, convenience, and aesthetics thereof, and

WHEREAS, the City Commission adopted Ordinance No. 2729 on September 29, 1987 creating Article VI, Section 28–39 thru 28–47 of the "Code of the City of Coral Gables", which provides regulations pertaining to newsracks on public rights-of-way, and

WHEREAS, the City Commission modified the provisions of Article VI by adopting the following amendatory ordinances: Ordinance No. 2780, Ordinance Ordinance No. 2865, Ordinance No. 2882, Ordinance No. 2901, and Ordinance No. 2908,

NOW, THEREFORE, BE IT ORDAINED BY THE COMMISSION OF THE CITY OF CORAL GABLES:

*SECTION 1.* That Section 17–30, of the "Code of the City of Coral Gables", entitled, "Schedule of License Fees", and in particular sub-paragraph (66)(c)(1)(f) thereof, is revised to delete newspaper operators and vending machines from occupational licensing.

*SECTION 2.* That Chapter 28 of the "Code of the City of Coral Gables", entitled, "Street and Sidewalks", shall be and it is hereby amended by adding thereto the following Article:

### ARTICLE VI. NEWSRACKS ON PUBLIC RIGHTS–OF–WAY

*Sec. 28–38. Purpose and Criteria.* The purpose of the following is to promote the public health, safety and welfare through the regulation of placement, type, appearance, servicing and insuring of newsracks on public rights-of-way so as to: (Ordinance No. 2882, 10/24/89)

(a) Provide for pedestrian and driving safety and convenience;

(b) Restrict unreasonable interference with the flow of pedestrian or vehicular traffic including ingress into or egress from any residence or place of business, or from the street to the sidewalk by persons exiting or entering parked or standing vehicles;

(c) Provide for public and property safety during hurricane conditions;

(d) Provide reasonable access for the use and maintenance of poles, posts, traffic signs or signals, hydrants, mailboxes and access to locations used for public transportation purposes;

(e) Relocate and/or replace newsracks which result in a visual blight and/or excessive space allocation on the public rights-of-way, or which unreasonably detract from the aesthetics of store window displays, adjacent landscaping and other improvements; as well as to have abandoned newsracks removed (Ordinance No 2882, 10/24/89);

(f) Maintain and protect the values of surrounding properties;

(g) Reduce unnecessary exposure of the public to personal injury or property damage;

(h) Treat all newspapers equally regardless of their size, content, circulation, or frequency of publication;

(i) Maintain and preserve freedom of the press;

(j) Cooperate to the maximum with newspaper distributors.

*Sec. 28–39. Definitions.*

(a) "Newsracks" shall mean any type of unmanned device for the vending or free distribution of newspapers or news periodicals.

(b) "Public right-of-way" shall mean any public street, highway, sidewalk, parkway or alley.

*Sec. 28–40. Newsrack certificate of compliance.* No person shall place, affix, erect, construct or maintain a newsrack without first obtaining a one-time only certificate of compliance for each newsrack in accordance with the provisions of this Ordinance.

*Sec. 28–41. Requirements and duties.*

(a) *General Placement of newsracks.*

Subject to the prohibitions set forth in subsection (a) of Section 2840 of this chapter, newsracks shall be placed parallel to and no less than eighteen (18) inches nor more than twenty-four (24) inches from the edge of the curb, unless the City determines that placement near a curb is not suitable, in which case the City may authorize placement near the wall of a building. Newsracks placed near the wall of a building must be placed parallel to and not more than six (6) inches from the wall.

(b) *Installation and Maintenance.*

(1) Newsracks shall be single pedestal, TK–80PM or K–80PM SHO–RACK with special pedestal mount and fourteen inch (14″) square base plate (mandated), or TK–80 or K–80 SHORACK with special pedestal and 14 inch square base plate (allowed only if demand warrants at the installation location) or equivalent. Under "warranted demand" a Newspaper Publishing Company may include with ordinary demand a reasonable percentage factor to accommodate peak yearly distribution in the quantity of newspapers dispensed, and the City shall not unreasonably withhold approval of such proposal by the Newspaper Publishing Company in accordance with Sec. 28–38 (Ordinance No. 2882, 10/24/89).

(2) Newsracks shall have gloss brown pedestals, gloss beige sides and door, and gloss brown coin box, coated per standard SHO–RACK specifications. The height of the cabinet top of all newsracks shall be 39 inches above the finished grade level. (Ordinance No. 2865, 9/29/89)

(3) Newsracks shall carry no card holders or advertising except the name of the newspaper being dispensed centered fifteen inches (15″) from the top of the cabinet, with duplicate lettering on the front and back of the cabinet, such lettering not exceeding one and three-quarters inches (1¾″) in height. (Ordinance No. 2882, 10/24/89)

(4) Newsracks for free newspapers may omit the coin box and may have

the pull bar welded to the door to produce an "Honor Rack".

(5) Newsracks shall be maintained in good working order at all times, freshly painted and with unbroken hoods.

(6) The name, address, and telephone number of a responsible person who may be contacted at any time concerning the newsrack shall be displayed on the hood of the newsrack in such a manner as to be readily visible and readable to a prospective customer thereof.

(7) Mounts shall be bolted in place through four standard holes in the base plate in accordance with standards provided in Section 28–47.

*Sec. 28–42. Prohibitions.*

(a) *Specific.* No newsrack shall be placed, installed, used or maintained:

(1) Within five (5) feet of any marked crosswalk.

(2) Within ten (10) feet of any unmarked crosswalk.

(3) Within ten (10) feet of any fire hydrant, fire call box, police call box or other emergency facility.

(4) Within five (5) feet of any driveway.

(5) Within five (5) feet ahead of, and fifteen (15) feet to the rear of any sign marking a designated bus stop, measured along the edge of pavement.

(6) Within two (2) feet of any bus bench, or plaza bench.

(7) At any location whereby the clear space for the passageway of pedestrians is reduced to less than six (6) feet.

(8) Where a vertically-protruding member of the Newsracks is on or within twelve inches (12″) of any area improved with lawn, or hedges, or within three feet (3′) of flowers or trees. (Ord. No. 2882, 10–24–89)

(9) Within three (3) feet of any display window of any building abutting the sidewalk or parkway or in such a manner as to impede or interfere with the reasonable use of such window display purpose, or within five (5) feet of a building entrance.

(10) Within one hundred fifty (150) feet of another newsrack containing the same newspaper or news periodical except where separated by a street corner. Where warranted by the quantity of newspaper sales, the Public Works Director may allow two newsracks of the same newspaper to be placed side by side.

(11) Facing another newsrack, divided only by the width of a sidewalk or pedestrian walk.

(12) On or within two (2) feet of signs, parking meters, street lights or utility poles.

(b) *General.* The general prohibitions common to all business as specified in Chapter 17 of the Code shall be applicable.

*Sec. 28–43.* Enforcement Procedures. (Ordinance No. 2882, 10/24/89)

(a) Non conforming newsracks. Within one-hundred fifty (150) days after this ordinance becomes effective and at any time thereafter, any newsrack in violation of any provision of this Chapter shall be subject to remedy and due process under the provisions of Chapter 8B of the Code of the City of Coral Gables, entitled Code Enforcement Board. (Ordinance No. 2908, 4/24/90)

(b) Abandonment. In the event any newsrack installed pursuant to this Chapter does not contain the publication specified therefor within a period of forty-eight (48) hours after release of the current issue, the Code Enforcement Division may deem the newsrack abandoned and take appropriate action under Chapter 8B of the Code. In addition, a newsrack shall be deemed abandoned when no publication is in the newsrack for a period of more than seven (7) consecutive days.

In the event a Newspaper Publishing Company or its Distributor desires to voluntarily abandon a newsrack location, said Distributor shall notify the Public Works Director, completely remove the newsrack and mount, and restore the public right-of-way to a safe condition, leaving no holes or projections in the mounting surface.

*Sec. 28–44.* Application and issuance of Certificate of Compliance. (Ordinance No. 2901, 2/27/90)

(a) *Issuing authority.* The issuing authority and coordinator shall be the Public Works Director. The Public Works Director is responsible for fairly coordinating and administering the physical placement of newsracks of the type and location herein specified, and upon compliance herewith is responsible for issuing the certificates of compliance. (Ordinance No. 2780, 5/10/88)

(b) *Approving authorities.* The approving authorities shall be the Public Service Director, the Parking Director and the Public Works Director. The Public Service Director shall provide review and approval only as to compliance with Section 28–42(a)(8) herein. The Parking director shall provide review and approval only as to compliance with Section 28–42(a)(12) herein. The Public Works Director shall provide review and approval coordination with the Public Service Director and the Parking Director, as well as review and approval only as to compliance with Section 28–42(a)(1–7 and 9–11) and other Sections of this Chapter relating to Certificates of Compliance (Ord. No. 2780, 5–10–88).

(c) *Applications.* The applicant shall file with the Public Works Director a written application for an installation certificate of compliance which shall contain the following information:

(1) The name, address and telephone number of the applicant, who is the owner and/or principal in responsible charge of the newsrack(s). (Ord. No. 2882, 10–24–89)

(2) The name, address and telephone number of a responsible person whom the City may notify or contact at any time concerning the applicant's newsracks.

(3) The number of newsracks and the proposed location of each shown on a drawing provided by Public Works as in part (d) below.

(4) Names of newspapers or periodicals to be contained in each rack.

(5) Type or brand of newsrack, including an illustration and description of the newsrack and mount if other than a single pedestal, TK–80PM or K–80PM SHORACK with special pedestal mount and fourteen inch (14″) square base plate (mandated) or TK–80 or K–80 SHORACK with special pedestal mount and fourteen inch (14″) square base plate (allowed only if demand warrants at the installation location), as per Code of the City of Coral Gables Subsection (b), entitled "Installation and Maintenance", of Sec. 28–41, entitled "Requirements and Duties". (Ord. No. 2882, 10–24–89)

(d) *Procedure.* The Public Works Department shall:

(1) Develop a map which is to a large enough scale to show general citywide locations of newsracks by each publisher or distributor.

(2) Request a list of proposed newsrack locations, marked on the above map, from each distributor.

(3) Prepare a scale drawing or aerial photograph of each newsrack location showing the position and name of each newsrack at that location.

(4) Obtain approvals of the above newsrack drawings from the Parking Director and the Public Service Director.

(5) Obtain confirmation approvals of the above approved newsrack drawings from each distributor.

(6) Have the Public Works Survey Crew, following certificate of compliance issuance, then mark placement locations with a template so that installation crews will have no problem.

(e) *Issuance of certificate of compliance.* Upon a finding by the Public Works Director that the applicant is in compliance with the provisions of this Chapter and having received the required approvals from the Parking Director and the Public Service Director, the Public Works Director shall cause to be issued a certificate of compliance for installation

by the newspaper publishing company in accordance with the application and the provisions of this Chapter.

(f) *Denial of certificate of compliance.* If a certificate of compliance for some newsrack location(s) applied for shall be denied, the applicant shall be immediately notified of the specific cause of such denial by the Public Works Director, who will suggest alternative location(s) therefor. The applicant may reapply for substitute alternative location(s) at no additional certificate of compliance fee.

(g) *Additional Newsrack Certificate(s) of Compliance.* If at any time after initial application for an installation Certificate of Compliance a Publisher wishes to install additional newsracks, then the above Procedure and Applications paragraphs are to be repeated in accordance with the provisions of this Chapter. Under Section 28–45 any additional returnable bond deposit required will credit any amount still on account. Additional Certificate(s) of Compliance fee(s) shall be in accordance with Sec. 28–46, except that the $50.00 Publisher's fee is waived if previously paid. (Ord. No. 2882, 10–24–89)

*Sec. 28–45. Insurance.* Prior to the issuance of a certificate of compliance by the Public Works Director, the applicant shall furnish to the Public Works Director, a certificate of insurance and a one time only returnable bond deposit, both in specific accordance with the terms of Section 28–33 of the Code. Reasonable evidence of equivalent self-insurance coverage may be substituted by the applicant for the above certificate of insurance, subject to the approval of the City Attorney. Insurance under this Section shall run continuously with the presence of the applicant's newsrack(s) in City rights-of-way, and any termination or lapse of such insurance shall be violation of this Chapter, subject to appropriate remedy by the Code Enforcement Division under Chapter 8B of the Code of the City of Coral Gables. (Ord. No. 2882, 10–24–89)

*Sec. 28–46. Fees.* There shall be a one-time only certificate of compliance fee in the amount of $50.00 (fifty dollars) for each newspaper publisher plus $10.00 (ten dollars) per newsrack. Failed inspections are subject to a reinspection fee of $5 (five dollars). All of the above fees will be used to defray administrative expenses related to this ordinance only, and any revenues over expenses remaining after the implementation of this ordinance will be returned to the newspaper publishers in proportion to their respective contributions.

(a) *Appeals.* Any applicant who has been denied a certificate of compliance pursuant to the provisions of this Chapter may file an appeal with the City Commission by requesting in writing to the City Manager appearance before the Commission in regular session assembled. (Ord. No. 2882, 10–24–89)

*Sec. 28–47. Newsrack Mounting Standards.*

(1) Foundation four inch (4") minimum concrete, 2500 psi (28 day strength), Class I.

(2) Two inch (2") minimum concrete edge distance for bolts.

(3) One-half inch (½") chamfer all concrete edges.

(4) Three-eighths of an inch (⅜") diameter galvanized lag bolt mounts, three inch (3") minimum imbedment, through four (4) corners of the pedestal base. (Ord. No. 2882, 10–24–89)

*SECTION 3.* That the following ordinances shall be and they are hereby rescinded: Ordinance No. 2729, Ordinance No. 2780, Ordinance No. 2865, Ordinance No. 2882, Ordinance No. 2901, and Ordinance No. 2908.

*SECTION 4.* That if any section, subsection, sentence, clause, phrase, word or amount of this ordinance shall be declared unconstitutional or invalid by competent authority, then the remainder of the ordinance shall not be affected thereby, and shall remain in full force and effect.

**SECTION 5.** That all ordinances or parts of ordinances inconsistent or in conflict herewith shall be and they are hereby repealed insofar as there is conflict or inconsistency.

PASSED AND ADOPTED THIS FIFTEENTH DAY OF MAY, A.D., 1990

APPROVED:

GEORGE M. CORRIGAN
MAYOR

ATTEST:

VIRGINIA L. PAUL
CITY CLERK

CITY OF CORAL GABLES, FLORIDA

ORDINANCE NO. 2984

AN ORDINANCE AMENDING CHAPTER 22 OF "CODE OF CITY OF CORAL GABLES" ENTITLED "STREETS, SIDEWALKS AND OTHER PUBLIC PLACES" AND IN PARTICULAR ARTICLE VII, "NEWSRACKS ON PUBLIC RIGHTS-OF-WAY" AS IT PERTAINS TO SECTIONS 22-156, 22-159, 22-160, 22-161, 22-162, 22-163, 22-164, 22-165, 22-166; FOR PURPOSE OF MAKING REVISIONS, ADDITIONS AND/OR DELETIONS TO NEWSRACK REGULATIONS; DECLARING EMERGENCY MEASURE FOR PURPOSE OF WAIVING THIRTY-DAY WAITING PERIOD AND PROVIDING EFFECTIVE DATE OF MARCH 31, 1992; AND REPEALING ALL ORDINANCES INCONSISTENT HEREWITH.

WHEREAS, pursuant to Sec. 22-157 of the City Code entitled, "Purpose and Criteria", the City of Coral Gables retained Consultant Legal Counsel in response to a newspaper complaint pertaining to newsrack regulations, and

WHEREAS, Consultant Legal Counsel pursuant to said Sec. 22-157 recommended certain revisions, additions, and/or deletions to the newsrack regulations as hereinafter set forth,

NOW, THEREFORE, BE IT ORDAINED BY THE COMMISSION OF THE CITY OF CORAL GABLES:

**SECTION 1.** That Chapter 22 of the "Code of the City of Coral Gables" entitled, "Streets, Sidewalks and Other Public Places" shall be and it is hereby amended and in particular Article VII, "Newsracks on Public Rights-of-Way" as it pertains to Sections 22-156, 22-159, 22-160, 22-161, 22-162, 22-163, 22-164, 22-165, 22-166; said amendment for the purpose of making revisions, additions and/or deletions to the newsrack regulations as follows:

CHAPTER 22, STREETS, SIDEWALKS AND OTHER PUBLIC PLACES ARTICLE VII, NEWSRACKS ON PUBLIC RIGHTS-OF-WAY

SEC. 22-156. DEFINITIONS. The following words, terms and phrases, when used in this article, shall have the meaning ascribed to them in this section, except where the context clearly indicates a different meaning:

(a) No change.

(b) No change.

(c) "Equivalent" newsrack means any newsrack which is of the same size, dimensions and style of the specified newsrack.

(d) "If demand warrants"/"warranted demand" means that the measured newspaper stack height needed to meet the newspaper publisher's or distributor's peak annual distribution at the requested newsrack location, as proven by the newspaper publisher or distributor, exceeds fourteen inches (14").

SEC. 22-157. PURPOSE AND CRITERIA. No change.

SEC. 22-158. CERTIFICATE OF COMPLIANCE REQUIRED. No change.

SEC. 22-159. APPLICATION AND ISSUANCE OF CERTIFICATE OF COMPLIANCE.

(a) Issuing Authority. No change.

(b) Approving Authorities. The approving authorities shall be the Public Service Director, the Parking Director and the Public Works Director. The Public Service Director shall provide re-

view and approval only as to compliance with Sec. 22–166(8), Specific Prohibitions. The Parking Director shall provide review and approval only as to compliance with Sec. 22–166(10), Specific Prohibitions. The Public Works Director shall provide review and approval coordination with the Public Service Director and the Parking Director, as well as review and approval only as to compliance with Sec. 22–159(c)(e)–(g), Application and Issuance of Certificate of Compliance; Sec. 22–160, Insurance; Sec. 22–161, Fees; Sec. 22–163, Placement Generally; Sec. 22–164, Installation and Maintenance; Sec. 22–165, Newsrack Mounting Standards; Sec. 22–166, Specific Prohibitions (1)–(7)(9).

(c) Applications. The applicant shall file with the Public Works Director a written application for an installation certificate of compliance which shall contain the following information:

(1) No change.

(2) No change.

(3) The number of newsracks and the proposed location of each shown on a drawing provided by Public Works as in subsection (d), Procedure below.

(4) Names of newspapers or periodicals to be contained in each newsrack.

(5) Type or brand of newsracks, including an illustration and description of the newsrack and mount if other than a single pedestal TK–80PM or K–80PM SHORACK with special pedestal mount and fourteen inch (14″) square base plate (mandated) or TK–80 or K–80 SHORACK with special pedestal mount and fourteen inch (14″) square base plate (allowed only if demand warrants at the installation location), or a newsrack manufactured with modifications to the door, window and cabinetry of the above-described newsracks to accommodate vertically-formatted ("Tabloid-type") newspaper display and distribution, as per Sec. 22–164, Installation and Maintenance.

(d) Procedure. No change.

(e) Issuance of Certificate of Compliance. Upon a finding by the Public Works Director that the applicant is in compliance with the provisions of this article and having received the required approvals from the Parking Director and Public Service Director, the Public Works Director shall cause to be issued a certificate of compliance for installation by the newspaper publishing company. Such issuance shall be made within five (5) working days of the City's receipt of the completed application.

(f) Denial of Certificate of Compliance. If a certificate of compliance for some newsrack location applied for shall be denied, the applicant shall be notified within five (5) working days of the City's receipt of the completed application. The applicant shall be advised of the specific cause of such denial by the Public Works Director, who will suggest alternative locations therefor. The applicant may reapply for substitute alternative location at no additional certificate of compliance fee.

(g) Additional Certificate of Compliance. If at any time after initial application for an installation certificate of compliance a publisher wishes to install additional newsracks, then subsections (c), Applications, and (d), Procedure, above are to be repeated in accordance with the provisions of this article. Under Sec. 22–160, Insurance, any additional returnable bond deposit required will credit any amount still on account. Additional certificate of compliance fees shall be in accordance with Sec. 22–161, Fees, except that the $50.00 publisher's fee is waived if previously paid.

SEC. 22–160. INSURANCE.

(a) Prior to the issuance of a certificate of compliance by the Public Works Director, the applicant shall furnish to the Public Works Director a certificate of insurance and a one-time only returnable bond deposit, both in specific accordance with the terms of Sec. 22–113, except that returnable bonding amounts for newsrack installations shall be:

| Total Proposed Newsracks | Total Returnable Bond |
|---|---|
| 1 to 4 | $150 |
| 5 to 10 | $300 |
| 11 to 20 | $500 |
| 21 and up | $700 |

(b) Reasonable evidence of equivalent self-insurance coverage may be substituted by the applicant for the above certificate of insurance. Insurance under this section shall run continuously with the presence of the applicant's newsrack in City rights-of-way, and any termination or lapse of such insurance shall be a violation of this article, subject to appropriate remedy by the Code Enforcement Division under Sec. 2–61 et seq. of this Code.

SEC. 22–161. FEES. There shall be a one-time only certificate of compliance fee in the amount of fifty dollars ($50.00) for each newspaper publisher plus ten dollars ($10.00) per newsrack. Failed inspections are subject to a reinspection fee of five dollars ($5.00). All of the above fees will be used to defray administrative expenses relating to this article only, and any revenues over expenses remaining after the implementation of this article will be returned to the newspaper publishers in proportion to their respective contributions.

SEC. 22–162. APPEALS. Any applicant who has been denied a certificate of compliance pursuant to the provisions of this article may file an appeal with the City Commission by requesting in writing to the City Manager appearance before the Commission to review said denial. The appeal shall be heard by the Commission within thirty (30) days of the filing of the appeal or at the next regularly scheduled agenda, whichever is sooner. The decision of the Commission on appeal is subject to judicial review as provided by the laws of the State of Florida.

SEC. 22–163. PLACEMENT GENERALLY. Subject to the prohibitions set forth in Sec. 22–166, Specific Prohibitions, newsracks shall be placed parallel to and not less than eighteen inches (18″) nor more than twenty-four inches (24″) from the edge of the curb. Newsracks placed near the wall of a building must be placed parallel to and not more than six inches (6″) from the wall.

SEC. 22–164. INSTALLATION AND MAINTENANCE.

(a) Newsracks shall be single pedestal TK–80PM or K–80PM SHORACK with special pedestal mount and fourteen inch (14″) square base plate (mandated) or TK–80 or K–80 SHORACK with special pedestal and fourteen inch (14″) square base plate (allowed only if demand warrants at the installation location) or equivalent. Manufactured modifications to the door, window, and cabinetry for the above-described newsracks to accommodate vertically-formatted, "tabloid-type" newspaper display and distribution are acceptable.

(b) Newsracks shall have gloss brown pedestals, gloss beige sides and door and gloss brown coin box. The height of the cabinet top of all newsracks shall be thirty-nine inches (39″) above the finished grade level.

(c) Newsracks shall carry no card holders or advertising except the name of the newspaper being dispensed centered fifteen inches (15″) from the top of the cabinet, with duplicate lettering on the front, sides and back of the cabinet, such lettering not exceeding one and three-quarters inches (1-¾″) in height. The above fifteen inch (15″) dimension may be adjusted on the door by the manufacturer to accommodate modifications for vertically-formatted, "tabloid-type" newsracks.

(d) No change.

(e) No change.

(f) Mounts shall be bolted in place through four (4) standard holes in the base plate in accordance with standards provided in Sec. 22–165, Newsrack Mounting Standards. Newsrack cabinet tops shall be installed and checked for level; a water-soluble, paintable, 10–year caulk of gloss brown color, matching the base plate, shall be applied and wiped to seal

around the base plate and the mounting surface.

(g) Changed to (f) above.

SEC. 22–165. NEWSRACK MOUNTING STANDARDS. The following standards shall be applicable to the mounting of newsracks in this City:

(1) No change.

(2) No change.

(3) No change.

(4) Three-eighths inch (⅜″) diameter hot-dipped galvanized hex bolt mounts, three-inch (3″) minimum imbedment, threads down, through four (4) corners of the pedestal base.

SEC. 22–166. SPECIFIC PROHIBITIONS. No newsrack shall be placed, installed, used or maintained: (Specific prohibitions were formerly referred to as subsection (a))

(1) Within five feet (5′) of any marked crosswalk.

(2) Within ten feet (10′) of any unmarked crosswalk.

(3) Within ten feet (10′) of any fire hydrant, fire call box, police call box or other emergency facility.

(4) Within five feet (5′) of any driveway.

(5) Within five feet (5′) ahead of, and fifteen feet (15′) to the rear of any sign marking a designated bus stop, measured along the edge of pavement.

(6) Within two feet (2′) of any bus bench, or plaza bench.

(7) At any location whereby the clear space for passageway of pedestrians is reduced to less than six feet (6′).

(8) Where a vertically protruding member of the newsracks is on or within twelve inches (12″) of any area improved with lawn or hedges or within three feet (3′) of flowers or trees.

(9) Within three feet (3′) of any display window of any building abutting the sidewalk or parkway or in such a man-

ner as to impede or interfere with the reasonable use of such window display purpose, or within five feet (5′) of a building entrance.

(10) Deleted.

(11) Deleted.

(10) On or within two feet (2′) of signs, parking meters, street lights or utility poles.

(12) Changed to (10) above.

(b) Deleted. (General prohibition provision)

SEC. 22–167. ENFORCEMENT PROCEDURES—NON–CONFORMING NEWSRACKS. No change.

SEC. 22–168. ENFORCEMENT PROCEDURES—ABANDONED NEWSRACKS. No change.

*SECTION 2:* That this ordinance is hereby declared to be an emergency measure for the purpose of waiving thirty-day waiting period, providing an effective date of March 31, 1992.

*SECTION 3.* That all ordinances or parts of ordinances inconsistent or in conflict herewith shall be and they are hereby repealed insofar as there is conflict or inconsistency.

PASSED AND ADOPTED THIS THIRTY–FIRST DAY OF MARCH, A.D., 1992.

APPROVED:

GEORGE M. CORRIGAN
MAYOR

ATTEST:

VIRGINIA L. PAUL
CITY CLERK
B/H(5); B/H(5)