**GOLD COAST PUBLICATIONS, INCORPORATED, a Delaware corporation d/b/a ¡Exito!, Plaintiff–Appellee–Cross–Appellant,**

**New Times Newspaper of Florida, Intervenor–Plaintiff,**

**v.**

**George M. CORRIGAN, individually as the Mayor of the City of Coral Gables, James Barker, individually as Vice Mayor of the City of Coral Gables, William H. Kerdyk, individually as City Commissioner of the City of Coral Gables, Bob Hildreth, individually as City Commissioner of the City of Coral Gables, Wayne "Chip" Withers, individually as City Commissioner of the City of Coral Gables, City of Coral Gables, a municipal corporation and political subdivision of the State of Florida, Alan L. Richman, as Code Enforcement Officer of the City of Coral Gables, Coral Gables City Commission, the governing body of the City of Coral Gables, Defendants–Appellants, Cross–Appellees.**

**No. 92–4764.**

United States Court of Appeals, Eleventh Circuit.

Dec. 30, 1994.

---

Joanne Fanizza, Ft. Lauderdale, FL, for appellee.

Before TJOFLAT, Chief Judge, DUBINA, Circuit Judge, and RONEY, Senior Circuit Judge.

TJOFLAT, Chief Judge:

This case involves a challenge to the constitutionality of a municipal ordinance regulating the placement of newsracks on public rights-of-way in the City of Coral Gables, Florida ("the City"). A newspaper publisher contends that the Ordinance is a facially invalid abridgment of the newspaper's rights of free speech and free press under the First Amendment of the United States Constitution and comparable provisions of the Florida Constitution, as well as a due process and equal protection violation under both the Federal and Florida Constitutions. The City asserts that the Ordinance represents valid place or manner restrictions that further the City's aesthetic and safety interests.

In ruling on Gold Coast's motion for a preliminary injunction, the district court concluded that the Ordinance was facially valid except for three provisions that require the use of a particular make and model of newsrack or its "equivalent," require a uniform color for all newsracks, and specify the size of lettering on the newsracks. The district court enjoined the enforcement of these three provisions, but allowed the enforcement of the other regulations in the Ordinance. Whether viewed as potential prior restraints, limitations on commercial speech, or restrictions on noncommercial speech, the disputed provisions of the Ordinance do not violate the First Amendment. Thus, we conclude that the district court erred in enjoining the enforcement of portions of the Ordinance. Accordingly, we reverse the district court's grant of injunctive relief regarding the provisions on equivalent newsracks, uniform color, and size of lettering, and we affirm the district court's denial of injunctive relief regarding the remaining provisions of the Ordinance.

Esther E. Galicia, Coral Gables, FL, for appellant.

Stanford Bohrer, Miami, FL, for intervenor.

## I.

### A.

Following its adopted motto, "the City Beautiful," the City of Coral Gables has emphasized aesthetics in planning development and promoting the City. During the 1980s, a task force [1] studied methods of improving the appearance of the City's business district. As one aspect of its work, the task force reviewed alternatives for regulating the proliferation of newsracks in the downtown area. After studying the condition of newsracks in the City, as well as other cities' restrictions on newsracks, the task force developed a proposed Ordinance to regulate newsracks and revised its proposal several times based on input from newspaper publishers and public hearings. Following review by the Planning and Zoning Department, the Public Works Department, the Chamber of Commerce, the City Attorney, and the City Manager, the draft Ordinance was adopted by the City Commission in 1987. A subsequent version of the Newsrack Ordinance is at issue in this case, Ordinance 2911, adopted on May 15, 1990, as amended by Ordinance 2984, adopted on March 31, 1992. Coral Gables, Fla., Code ch. 22, art. VII (1992) [hereinafter collectively "the Newsrack Ordinance" or "the Ordinance"].

The various provisions of the Newsrack Ordinance prescribe the procedure for obtaining permits to place newsracks on public rights-of-way throughout the City as well as specific regulations regarding the location, design, lettering, and color of newsracks. Some of the purposes of the Ordinance, as set forth in Section 22–157,[2] are to: (1) "[p]rovide for pedestrian and driving safety and convenience"; (2) "[r]estrict unreasonable interference with the flow of pedestrian or vehicular traffic"; (3) "[p]rovide for public and property safety during hurricane conditions"; (4) "[p]rovide reasonable access for the use and maintenance of poles, posts, traffic signs or signals, hydrants, [and] mailbox-

es"; (5) "[r]elocate and/or replace newsracks which result in a visual blight"; and (6) "[m]aintain and protect the values of surrounding properties."

Section 22–159 describes the application procedure for obtaining certificates of compliance, including the City officials responsible for approval and compliance with specific provisions, and the required supporting documents, such as a map showing the location of all newsracks belonging to a particular publisher or distributor. Section 22–160 requires that a publisher obtain a certificate of insurance and pay a one-time refundable bond deposit, which is calculated based on the number of newsracks displayed. Section 22–161 sets forth fees, including a one-time fifty dollar per publisher certificate of compliance fee, a ten dollar per newsrack certification fee, and a five dollar reinspection fee for all failed inspections, which are all calculated to defray administrative costs with any excess revenues returned to publishers. Section 22–162, covering appeals from certification denials, provides for a hearing by the City Commission within thirty days of filing "or at the next regularly scheduled agenda, whichever is sooner," and for judicial review under Florida law.

Section 22–163, governing the general placement of newsracks, specifies that the newsracks must be placed parallel to the curb between eighteen and twenty-four inches from the edge of the curb or parallel to a building not more than six inches from the building's wall. In addition, Section 22–166 sets forth specific prohibitions on placing newsracks within certain distances of crosswalks, bus stops, benches, fire hydrants, emergency call boxes, driveways, display windows, street signs, parking meters, street lamps, or utility poles.

Section 22–164(a) requires publishers to use a particular make and certain models of newsracks (Shorack TK–80PM or K–80PM), or if demand warrants, a newsrack that holds

---

1. This group, named the "Miracle Mile/Ponce Task Force" after two intersecting streets in the business district that were the focus of the beautification effort, consisted of Chamber of Commerce members, merchants, property owners, and citizens.

2. We will refer to the section numbers of Ordinance 2984, the Ordinance as amended, and explain any changes from Ordinance 2911 as necessary.

more newspapers (Shorack TK–80 or K–80) "or equivalent." Although Ordinance 2911 did not define equivalent, Section 22–156(c) states that " '[e]quivalent' newsrack means any newsrack which is of the same size, dimensions and style of the specified newsrack." Similarly, Ordinance 2911 did not mention modification of newsracks to hold tabloid-style[3] newspapers, but Section 22–164(a) stipulates that "[m]anufactured modifications to the door, window, and cabinetry for the above-described newsracks to accommodate vertically-formatted, 'tabloid-type' newspaper display and distribution are acceptable." Regarding the color of the newsracks, Section 22–164(b) mandates that "[n]ewsracks shall have gloss brown pedestals, gloss beige sides and door and gloss brown coin box." Section 22–164(c) prohibits card holders or advertisements on newsracks, but allows the name of the newspaper to be displayed on the sides, front, and back of the newsrack provided that the lettering is no larger than 1¾ inches in height and centered at fifteen inches from the top of the cabinet. Whereas Ordinance 2911 did not adjust these specifications for tabloid-style newspapers, Section 22–164(c) indicates that "[t]he above fifteen inch (15″) dimension may be adjusted on the door by the manufacturer to accommodate modifications for vertically-formatted, 'tabloid-style' newsracks."

### B.

In November 1991, appellee Gold Coast Publications, Inc. ("Gold Coast") began publishing ¡Exito!,[4] a tabloid-style, weekly Spanish-language newspaper directed at young, educated Hispanic professionals. ¡Exito! is distributed free of charge in the City of Coral Gables, and throughout Dade County, solely by means of newsracks; home delivery is not available. To attract readers to its new and relatively unknown publication, the newsracks carrying ¡Exito! were painted deep purple and prominently displayed the unique ¡Exito! logo in lime green, bright orange, or hot pink.[5] In addition, the newsracks were specifically designed to hold tabloid-style newspapers. By February 1992, ¡Exito!'s circulation had reached approximately 75,000, compared to 50,000 for its first issue.

On November 26, 1991, Alan L. Richman, Code Enforcement Officer for the City, notified ¡Exito!'s distributor by certified letter that newsracks displaying ¡Exito! did not comply with the Code, that the newsracks must be brought into compliance, and that if the newsracks were not in compliance upon reinspection thirty days later, the City would confiscate them. After receiving this notice, Gold Coast obtained a fifteen-day extension of the deadline for compliance; Gold Coast was unsuccessful, however, in obtaining an exemption from the uniform size, color, and design requirements that was granted to another publisher, New Times, Inc., based on an injunction entered in a separate state court action challenging the Newsrack Ordinance. On January 17, 1992, the City confiscated six of ¡Exito!'s newsracks[6] and subsequently informed ¡Exito!'s distributor that the newsracks would be released upon payment of fifty dollars per newsrack.

### 1.

On April 10, 1992, Gold Coast brought this action against the City.[7] Before the City's

---

3. The two main formats for newspapers are tabloid-style, such as the *New York Post, Village Voice,* or *National Enquirer,* and broadsheet, such as the *Wall Street Journal, New York Times,* or *Washington Post.*

4. ¡Exito! means "success" or "hit" in Spanish.

5. Gold Coast applied for trademark registration for the *¡Exito!* trade name, logo, and trade dress under state and federal trademark statutes; state trademark registration was granted in March 1992, and federal registration was pending when Gold Coast brought this suit.

6. Gold Coast alleges in its amended complaint that eight newsracks were confiscated, including one from private property. However, the district court found that six newsracks were seized, all from public rights-of-way. *Gold Coast Publications, Inc. v. Corrigan,* 798 F.Supp. 1558, 1562 (S.D.Fla.1992).

7. In addition to the City, Gold Coast named as parties-defendant, in their individual and official capacities, the following City officials: George M. Corrigan, Mayor of Coral Gables; James Barker, Vice Mayor; William H. Kerdyk, Bob Hildreth, and Wayne "Chip" Withers, City Commissioners; the Coral Gables City Commission,

response to Gold Coast's complaint was due, Gold Coast, having obtained leave of court, filed an amended complaint on May 26, 1992; meanwhile, New Times, Inc. ("New Times") the publisher of another tabloid-style, weekly newspaper, *New Times*, distributed through newsracks in the City of Coral Gables, intervened as a party-plaintiff.[8]

Gold Coast's amended complaint is framed in eleven substantive counts. Counts I and VII of the amended complaint allege that the Ordinance violates the newspaper's right to freedom of the press under the First Amendment and Article I, Section 4 of the Florida Constitution because (1) the permit requirement of Section 22–158 and the designated newsrack required by Section 22–164(a), which cannot accommodate tabloid-style newspapers, constitute impermissible prior restraints; (2) Section 22–159(b) gives the Public Works Director unbridled discretion to determine whether newsracks are equivalent under Section 22–156(c); (3) the location restrictions in Sections 22–166 and 22–163 are overbroad and not rationally related to health, safety, and welfare; (4) the fee schedule in Section 22–161 creates an impermissible tax; and (5) the application and installation procedures of Sections 22–159 and 22–165 create an impermissible burden on the exercise of free press rights. Counts V and X allege that Section 22–159(c)(3), requiring submission of a map showing the location of all *¡Exito!*'s newsracks, violates the right to free speech under the First Amendment and Article I, Section 4 of the Florida Constitution by forcing disclosure of trade secrets. Counts III and IX allege a violation of the Equal Protection Clause of the Fourteenth Amendment and Article I, Section 2 of the Florida Constitution because the Ordinance and the City discriminate against newspapers generally by exempting charitable and religious organizations from licensing provisions and by not subjecting other vending machines or fixtures, such as trash receptacles, to the uniform color and lettering requirements; against tabloid-style newspapers by specifying newsracks that can only hold broadsheet newspapers; and against *¡Exito!* in particular by refusing to grant the exemption given to *New Times*. Counts IV and XI allege violations of the Due Process Clause of the Fourteenth Amendment and Article I, Section 9 of the Florida Constitution because, among other things, the City's notice advising Gold Coast of its Ordinance violations lacked specificity. Count VI alleges violation of Gold Coast's civil rights pursuant to 42 U.S.C. § 1983 (1988) based on the constitutional violations described in the other counts. Counts II and VIII allege that Section 22–164(a)–(c), specifying uniform design, color, and size of lettering, violates the trademark protections of the Lanham Act, 15 U.S.C. §§ 1051–1127 (1988), and Chapter 495, Florida Statutes (1992) by prohibiting the use of the *¡Exito!* logo and trade dress. With respect to each count, Gold Coast seeks a declaration that the Ordinance is invalid and an order enjoining the enforcement of its provisions.

2.

The day after it filed its amended complaint, Gold Coast applied for a preliminary injunction restraining the City from enforcing the Ordinance. Thereafter, the district court held a four-day evidentiary hearing on Gold Coast's application. On July 9, 1992, the district court, applying the standard for assessing facial constitutional challenges set forth in *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–59, 108 S.Ct. 2138, 2143–45, 100 L.Ed.2d 771 (1988), granted Gold Coast partial relief on Counts I and VII of the amended complaint by enjoining: (1) the use of the term "equivalent" in Section 22–164(a) of the Ordinance, which constituted an impermissible prior restraint of First Amendment protected speech because it allowed officials to exercise standardless discretion in determining which newsracks were equivalent; and (2) the requirement of uniform color and the limitation

consisting of the Mayor, Vice Mayor, and City Commissioners; the City of Coral Gables; and Alan L. Richman, the Code Enforcement Officer. They have been dismissed from the case and, accordingly, are not before us.

8. The court permitted New Times to intervene because it was prosecuting a state court action challenging the constitutionality of the Ordinance.

on the size of lettering, which did not meet the standards for time, place, or manner restrictions enunciated in *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). *Gold Coast Publications, Inc. v. Corrigan,* 798 F.Supp. 1558, 1563–64, 1572–73 (S.D.Fla.1992). The court upheld the regulations regarding mounting, installation, and placement of newsracks as permissible place and manner restrictions and declared the licensing fees and insurance requirements constitutional. *Id.* at 1573. The district court then severed the invalid portions from the Ordinance and enjoined the City from enforcing those provisions. *Id.* at 1572–73. The City appeals the grant of injunctive relief; Gold Coast cross-appeals the court's refusal to enjoin the insurance provision of the Ordinance.

## II.

### A.

■ We review the district court's partial grant and partial denial of injunctive relief under an abuse of discretion standard. *Tally–Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1022 (11th Cir.1989). We accept the district court's findings of fact unless they are clearly erroneous and review questions of law *de novo. Id.*

■ To satisfy the requirements for a preliminary injunction, the movant must establish: (1) a substantial likelihood of succeeding on the merits; (2) a substantial threat of irreparable injury if relief is denied; (3) an injury that outweighs the opponent's potential injury if relief is granted; and (4) an injunction would not harm the public interest. *Id.* The district court noted that "the issuance of a preliminary injunction in the context of free speech turns solely on whether the challenged ordinance violates the First Amendment." *Gold Coast,* 798 F.Supp. at 1563. Because we conclude that the provisions of the Ordinance that the district court enjoined do not violate the First Amendment, Gold Coast fails to meet its burden of persuasion regarding the likelihood of success on the merits and, therefore, is not entitled to injunctive relief. *See Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 627 (11th Cir.1992).

### B.

■ Before turning to the merits of the First Amendment claim, we must first determine whether Gold Coast may properly bring a facial challenge to the Ordinance. In *Lakewood,* the Supreme Court held that

> a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers ... [where] [t]he law [has] a close enough nexus to expression ... to pose a real and substantial threat of the identified censorship risks.

486 U.S. at 759, 108 S.Ct. at 2145. Although the Coral Gables Ordinance does not include the annual licensing renewal found in *Lakewood, see id.,* the requirement of a certificate of compliance before installing any new newsracks or moving an old newsrack and the periodic inspections of existing newsracks, when coupled with the "equivalent" language of Section 22–164(a), could arguably provide the opportunity to discriminate based on the content of speech contained in the newspapers. Similarly, the Coral Gables Ordinance is directed at the very same expression at issue in *Lakewood*—the distribution of newspapers through newsracks on public rights-of-way. *See id.* at 753–54, 108 S.Ct. at 2142. Consequently, Gold Coast may facially attack the constitutionality of the Ordinance.

### III.

■ The First Amendment states that "Congress shall make no law ... abridging the freedom of speech, or of the press." U.S. Const. amend. I. It is well settled that the right to distribute newspapers through newsracks is protected under the First Amendment. *Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666, 673–74 (11th Cir.1984); *see also Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1196 (11th Cir.1991) (citing *Miami Herald* ). Nevertheless, a newspaper publisher does not have

complete freedom in setting up a newsrack distribution scheme. A municipality may regulate the placement of newsracks on streets and sidewalks provided that such regulations are valid time, place, or manner restrictions. *Gannett Satellite Info. Network, Inc. v. Township of Pennsauken,* 709 F.Supp. 530, 536 (D.N.J.1989).

### A.

■ The validity of restrictions on protected First Amendment expression depends upon the type of speech and the type of forum being regulated. Because there is no precedent classifying the color and size of lettering on newsracks as a particular type of speech, we initially analyze those provisions as restrictions on pure, noncommercial speech and subsequently as restrictions on commercial speech. The precise classification is irrelevant to the outcome of this case, however, because the challenged provisions are upheld under either commercial or noncommercial speech standards. The type of forum—a traditional public forum—remains constant throughout our analysis.

■ Traditional public fora are "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 954. Streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). In this case, the newsracks that Coral Gables seeks to regulate are located in a traditional public forum—on public rights-of-way.

■ Coral Gables' ability to limit expression in traditional public fora is "sharply circumscribed." *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 955. A limitation on the content of expression must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Id.* A content-neutral limitation on the time, place, or manner of expression must: (1) be "narrowly tailored to serve a significant government interest"; *and* (2) provide "ample alternative channels of communication." *Id.*

### 1.

■ We first determine whether the Ordinance is a content-based or content-neutral regulation. The Supreme Court recently reviewed the constitutionality of a municipal ordinance that prohibited newsracks containing "commercial handbills" but permitted newsracks containing newspapers.[9] *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, ——, 113 S.Ct. 1505, 1508, 123 L.Ed.2d 99 (1993). Because the ordinance differentiated between acceptable newsracks and unacceptable newsracks based on the content of the material inside the newsrack, the Court concluded that the regulation was not content neutral. *Id.* at ——, 113 S.Ct. at 1516–17. Coral Gables requires the owners of *all* newsracks to comply with the various provisions of the ordinance; there is no distinction made between publications based on their content.[10] For example, the uniform

---

**9.** The ordinance defined "commercial handbills" to include written or printed material that advertised products, services, businesses, meetings, events, or performances for the purpose of promoting sales or profits. *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, —— n. 2, 113 S.Ct. 1505, 1508 n. 2, 123 L.Ed.2d 99 (1993).

**10.** At oral argument, Gold Coast asserted that the Ordinance was not content neutral because it discriminated against tabloid newspapers by specifying newsracks that could not accommodate tabloid newspapers. This claim implicates two overlapping doctrines—content neutrality under the First Amendment and equal protection. *See Burson v. Freeman,* —— U.S. ——, ——,

n. 3, 112 S.Ct. 1846, 1850 n. 3, 119 L.Ed.2d 5 (1992). Although Gold Coast alleges in Counts III and IX of its amended complaint that this discrimination amounted to an equal protection violation, it has not cross-appealed the court's refusal to grant injunctive relief on these counts. Accordingly, we do not address the equal protection allegation.

As to the claim that the disparate impact makes the Ordinance content based, "[t]he principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech *because of* disagreement with the message it conveys. The government's purpose is the controlling consideration." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (em-

color and size of lettering restrictions affect all newspapers equally: An individual desiring to purchase a copy of the *Miami Herald* can no more easily distinguish a *Miami Herald* newsrack than can an individual wishing to pick up a copy of *iExito!*; each must be close enough to view either the lettering on the sides of the newsrack or the front page of the newspaper through the front window.[11] Consequently, the Ordinance is a content-neutral regulation and must be judged against the two requirements for the time, place, or manner restrictions.

### 2.

Turning to the first prong of the time, place, or manner test, the City has steadfastly contended that safety and aesthetic interests are the bases for the Newsrack Ordinance. The Supreme Court has recognized aesthetics and safety as significant government interests legitimately furthered through ordinances regulating First Amendment expression in various contexts. *See Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805–07, 104 S.Ct. 2118, 2129–30, 80 L.Ed.2d 772 (1984) (holding that Los Angeles' valid aesthetic interests supported a prohibition on posting signs, including political signs, on public property); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508–10, 101 S.Ct. 2882, 2893–94, 69 L.Ed.2d 800 (1981) (plurality opinion) (recognizing aesthetics and safety as valid interests in reviewing a prohibition on off-site commercial billboards and all non-commercial billboards); *see also Discovery Network*, —— U.S. at ——, 113 S.Ct. at 1517 (striking down, as content based, a prohibition on newsracks containing commercial handbills despite the recognition of safety and aesthetics as valid governmental interests). In most cases, the outcome turns not on whether the specified interests are signifi-

cant, but rather on whether the regulation is narrowly tailored to serve those interests.

 In examining the relationship between the City's interests and the effect on Gold Coast's First Amendment rights, the district court stated that the restriction must be "no greater than necessary" or no "broader than necessary" to accomplish the City's goals. *Gold Coast*, 798 F.Supp. at 1571. The Supreme Court, however, has expressly rejected the "less-restrictive-alternative analysis" for time, place, or manner regulations. *Ward v. Rock Against Racism*, 491 U.S. 781, 797–800, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989) (upholding an ordinance limiting the volume of music at concerts in Central Park's Naumberg Acoustic Bandshell) (citing *Regan v. Time, Inc.*, 468 U.S. 641, 657, 104 S.Ct. 3262, 3271, 82 L.Ed.2d 487 (1984) (White, J.)). Instead, the Court has adopted a "not substantially broader than necessary" standard to evaluate whether a regulation is narrowly tailored. *Id.* at 800, 109 S.Ct. at 2758. We now consider the relationship between the City's interests and the impact of the Ordinance in light of the "not substantially broader than necessary" standard.

### a.

Regarding the City's safety interest, the district court concluded that "[t]he evidence linking the regulation to the pedestrian and vehicular safety interests in this case is substantiated and definitive." *Gold Coast*, 798 F.Supp. at 1570. The district court's ruling upholding the provisions regulating placement and installation of newsracks was not cross-appealed. Consequently, we do not second guess the City's assessment that newsracks on public rights-of-way pose certain safety risks that the Ordinance seeks to minimize through its narrowly tailored re-

---

phasis added) (citation omitted). Gold Coast has produced no evidence that the City enacted the Ordinance because of a dislike of the messages conveyed by tabloid-style newspapers. In fact, Section 22–157 states that one of the purposes of the Ordinance is to "[t]reat all newspapers equally regardless of their size, content, circulation, or frequency of publication." Consequently, this argument fails.

11. At oral argument, Gold Coast alleged that the color and lettering provisions disproportionately affected *iExito!* because the newspaper was first introduced after the Ordinance was in effect and, therefore, could not attract new readers with its brightly colored newsracks. Whether the Ordinance has a disparate impact on *iExito!*, however, is an issue appropriate for an "as applied" challenge rather than a facial challenge.

strictions. *See Metromedia,* 453 U.S. at 508–09, 101 S.Ct. at 2893 ("We likewise hesitate to disagree with the accumulated, common sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety.").

b.

The Supreme Court has repeatedly deferred to the aesthetic judgments of municipalities and other government bodies when evaluating restrictions on protected expression. *See Taxpayers for Vincent,* 466 U.S. at 807, 104 S.Ct. at 2130; *Metromedia,* 453 U.S. at 512, 101 S.Ct. at 2895; *see also City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S.Ct. 925, 930, 89 L.Ed.2d 29 (1986) ("[A] city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'" (quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310 (1976) (plurality opinion))); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 298–99, 104 S.Ct. 3065, 3071–72, 82 L.Ed.2d 221 (1984) (upholding the National Park Service's restrictions on demonstrations in national parks). Likewise, lower courts have upheld ordinances limiting newsracks based on aesthetic interests.[12] *Chicago Observer, Inc. v. City of Chicago,* 929 F.2d 325, 328 (7th Cir.1991) (upholding limitations on the size of newsracks and off-premises advertisements on newsracks because "[c]ities may curtail visual clutter, for aesthetic and safety reasons"); *Jacobsen v. Harris,* 869 F.2d 1172, 1174 (8th Cir.1989) (upholding permit and insurance requirements as well as restrictions on the size, type, and location of newsracks); *Township of Pennsauken,* 709 F.Supp. at 538 (allowing limitations on the placement and methods of installation for newsracks).

Here, the City has taken several steps to enhance the aesthetics of the business district, including convening a task force to study beautification methods, researching how other cities have dealt with similar issues, developing a proposed Ordinance to correct some of the problems associated with newsracks, and revising that Ordinance based on input from affected parties. Gold Coast argues that the Ordinance goes too far in dictating uniform color and size of lettering because requiring publishers to maintain newsracks in good condition would adequately address the City's complaints of visual blight from unsightly newsracks. Although the district court accepted as credible the testimony of City officials regarding the safety and aesthetic rationales for the Ordinance, the court was not persuaded "that requiring newsracks to be a uniform color and restricting the size of lettering on the sides of newsracks are regulations narrowly tailored to serve those goals." *Gold Coast,* 798 F.Supp. at 1562, 1571. This argument, however, essentially relies on the less-restrictive-alternative analysis rejected in *Ward.*

When we weigh the City's aesthetic interest under the correct standard—"not substantially broader than necessary"—the uniform color and size of lettering requirements are narrowly tailored to achieve the City's objective. The Ordinance does not completely ban newsracks from public rights-of-way or prohibit the sale and distribution of newspapers. Similarly, publishers are permitted to display their name or logo in the color of their choice so long as the lettering is no larger than 1¾ inches. Certainly, the beige and brown colors specified in the Ordinance are not as eyecatching as the deep purple newsracks previously used to display *¡Exito!,* but "that reduction in visibility is the valid aesthetic interest to be served." *Township of Pennsauken,* 709 F.Supp. at 540.

---

**12.** Although several district courts have struck down newsrack ordinances for various reasons, their opinions have relied on standards subsequently rejected by the Supreme Court. *See, e.g., Chicago Newspaper Publishers Ass'n v. City of Wheaton,* 697 F.Supp. 1464, 1469 (N.D.Ill.1988) (rejecting a total ban on newsracks in residential areas under the least-restrictive-means test); *Providence Journal Co. v. City of Newport,* 665 F.Supp. 107, 115–16 (D.R.I.1987) (concluding that a city's aesthetic interests did not justify a newsrack ban because the ordinance was not part of a comprehensive plan); *Philadelphia Newspapers, Inc. v. Borough Council of Swarthmore,* 381 F.Supp. 228, 241–42 (E.D.Pa.1974) (using the least-restrictive-alternative test to invalidate a newsrack ordinance).

Gold Coast also argues that the color and lettering restrictions are invalid because they do not apply to other fixtures in the business district, such as awnings and trash receptacles. The Supreme Court has allowed cities to enact partial solutions to further their aesthetic interests, *see Taxpayers for Vincent*, 466 U.S. at 811, 104 S.Ct. at 2132 ("Even if some visual blight remains, a partial, content-neutral ban may nevertheless enhance the City's appearance."); *see also Metromedia*, 453 U.S. at 511–12, 101 S.Ct. at 2894–95, and has explicitly rejected a requirement that such solutions be part of a "comprehensive plan" to improve aesthetics, *Taxpayers for Vincent*, 466 U.S. at 807 n. 25, 104 S.Ct. at 2130 n. 25. Following those cases, this circuit has also permitted partial solutions addressing aesthetic concerns in the commercial speech context. *Supersign of Boca Raton, Inc. v. City of Fort Lauderdale*, 766 F.2d 1528, 1531–33 (11th Cir.1985) (upholding an ordinance prohibiting advertising vehicles while allowing advertisements on taxicabs and buses). Furthermore, other courts have upheld newsrack ordinances in the absence of an overall scheme of regulation. *See Chicago Observer*, 929 F.2d at 328–29; *Township of Pennsauken*, 709 F.Supp. at 537. Coral Gables chose to require that all newsracks be painted beige and brown consistent with its Mediterranean theme, but the City was not obligated to dictate the colors of trash receptacles or awnings to ensure that the newsrack regulation would survive constitutional attack. For these reasons, we reject the district court's conclusion that the color and size of lettering provisions are not narrowly tailored to serve the City's aesthetic goals.

### 3.

We now consider the second prong of the time, place, or manner test—whether the disputed provisions of the Newsrack Ordinance allow ample alternative channels of communication. The district court found that ample alternatives were available regarding the City's safety interests, but did not reach this issue regarding its aesthetic interests. *See Gold Coast*, 798 F.Supp. at 1572. As stated previously, the regulations in the Ordinance do not amount to a complete ban on newsracks from public rights-of-way. The placement and installation requirements leave open numerous possible locations for newsracks on public property throughout Coral Gables. Likewise, the color and size of lettering restrictions still allow publishers to display the name and logo of the newspaper in their choice of colors. Because ample alternative channels for communication are available, the disputed color and lettering regulations satisfy this final requirement, and, thereby, constitute valid time, place, or manner restrictions.

### B.

Viewing the provisions regarding the color and size of lettering as restrictions on commercial speech, the color and lettering on newsracks could be considered advertisements for the newspaper. Indeed, Gold Coast acknowledges that its brightly colored newsracks and distinctive logo are designed to attract readers.

We begin this analysis by noting that the First Amendment offers less protection to commercial speech than to noncommercial speech. *Metromedia*, 453 U.S. at 505–06, 101 S.Ct. at 2891–92 (stating that, although commercial speech "enjoys a substantial degree of First Amendment protection," such speech "could be forbidden and regulated in situations where [noncommercial speech] could not be"). Under the four-part test for evaluating restrictions on commercial speech set forth in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), (1) the speech must "concern[ ] lawful activity and [not be] misleading" to merit First Amendment protection; and the regulation of that speech must (2) "implement a substantial governmental interest"; (3) "directly advance[ ] that interest"; and (4) "reach[ ] no further than necessary to accomplish the given objective." *Metromedia*, 453 U.S. at 507, 101 S.Ct. at 2892 (citing *Central Hudson*, 447 U.S. at 563–66, 100 S.Ct. at 2350–51).

Applying the *Central Hudson* test to the Coral Gables Ordinance, the color and lettering on newsracks concerns lawful activi-

ty—the identification of newspapers—and is not misleading, assuming that the color and lettering properly identify the newspaper contained in the newsrack. As discussed above, the aesthetic concerns advanced by the City are a substantial governmental interest. In addition, the uniform color and limitation on the size of lettering directly advance the City's interest in minimizing visual blight and ensuring that newsracks blend into the City's Mediterranean theme. The validity of these restrictions ultimately turns on whether they reach no further than necessary to accomplish the City's aesthetic goals.

Although Gold Coast adamantly maintained at oral argument that the color and size of lettering represent pure, noncommercial speech, transforming its "less-restrictive-alternative" analysis into the commercial speech context, Gold Coast views the restrictions as overbroad because the City could have addressed aesthetic concerns with more modest measures. The specification of a uniform color and the 1¾ inch limit on lettering may appear arbitrary to Gold Coast, yet they represent a decision by the task force and the City Commission after considerable study and input from interested parties. As the Seventh Circuit noted in *Chicago Observer*:

> Whenever government draws a line, there will be cases close to the mark. One can always claim that a small change could have accommodated more conduct, at a little sacrifice in the government's objective. Choosing how much to accommodate at what sacrifice in other objectives is precisely the business of government, for the branches responsible to the people.

929 F.2d at 329. The City's determination that these provisions should apply to newsracks, but not to awnings or trash receptacles, represents a partial solution to aesthetic concerns akin to what a plurality of the Supreme Court approved in *Metromedia* and this court accepted in *Supersign*. Furthermore, the Coral Gables Ordinance is distinguishable from the Cincinnati ordinance struck down in *Discovery Network*. Cincinnati's interest in eliminating unsightly newsracks provided no basis for the distinction between commercial and noncommercial speech, and the resultant ban had a minimal impact on aesthetics because the vast majority of the newsracks contained newspapers classified as noncommercial speech. *Discovery Network*, —— U.S. at —— – ——, 113 S.Ct. at 1514–15. Thus, the uniform color and size of lettering limitations in the Ordinance are valid restrictions on commercial speech.

### C.

■■■ We now turn to the district court's analysis of the "equivalent" language of Section 22–164(a). Section 22–164(a) allows a publisher to use newsracks that are the "equivalent" of those specified in that section of the Ordinance. The City contends that the district court erred in concluding that "the ordinance's use of the term 'equivalent,' without designation of a decisionmaker and in the absence of narrow, objective and definite standards to guide the decision, functions as an unconstitutional prior restraint." *Gold Coast*, 798 F.Supp. at 1566.

One branch of the doctrine of prior restraints has evolved from a "long line of precedent . . . that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Lakewood*, 486 U.S. at 757, 108 S.Ct. at 2144 (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Staub v. City of Baxley*, 355 U.S. 313, 321–22, 78 S.Ct. 277, 281–82, 2 L.Ed.2d 302 (1958)). To avoid that risk, "the Constitution requires that the city establish neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered." *Id.* at 760, 108 S.Ct. at 2146.

In *Lakewood*, the Supreme Court addressed whether a newsrack licensing ordinance vested unbridled discretion in government officials. The challenged ordinance granted the mayor the authority to approve or reject applications for annual permits to place newsracks on public rights-of-way, subject only to the requirement that he provide reasons for any rejections, and allowed the

mayor to condition approval on "any 'other terms and conditions deemed necessary and reasonable by the Mayor.'" *Id.* at 753–54, 108 S.Ct. at 2142. The Court held those portions of the ordinance unconstitutional because there were "no explicit limits on the mayor's discretion," and "[t]he doctrine [forbidding unbridled discretion] requires that the limits ... be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Id.* at 769–70, 108 S.Ct. at 2150–51.

This court has also considered whether certain newsrack regulations constitute prior restraints. In *Miami Herald,* a provision of the Hallandale, Florida occupational license tax on vending machines required a licensee to comply with "all applicable provisions of the city code" before a license would be granted. 734 F.2d at 672. The court held the provision unconstitutional because it "vest[ed] city officials with untoward discretion to deny licenses, and furnishe[d] inadequate safeguards to ensure against abuse of that discretion." *Id.* at 676. In *Sentinel Communications,* the court reviewed an unwritten scheme for regulating the installation of newsracks at interstate rest areas in Florida. Concluding that "some minimal procedures and standards are required here to channel the discretion of [state] officials," 936 F.2d at 1199, the court remanded the case for an evidentiary hearing regarding the permit scheme because "[n]o written rules or regulations govern [the state official] in the exercise of his authority to grant or deny permission for a newspaper to install newsracks in public rest areas, nor are there procedures or standards in place that [he] is obligated to follow when reviewing requests or applications by newspapers to install newsracks at rest areas," *id.* at 1193.

The Coral Gables Ordinance is qualitatively different from the licensing schemes reviewed in *Lakewood, Miami Herald,* and *Sentinel Communications.* Coral Gables did not enact a licensing statute with a blanket provision requiring compliance with other unspecified conditions or regulations. Instead, the City developed a written scheme for regulating newsracks through a process that included input from newspaper publishers and other members of the community.

Ordinance 2984 provides explicit limits for City officials' discretion through neutral criteria and procedural safeguards set forth in the text of the Ordinance. Section 22–159(b) designates the Public Works Director as the decisionmaker regarding compliance with the installation and maintenance standards of Section 22–164, which includes the "equivalent" language. In addition, the definition of "equivalent" in Section 22–156(c)—"the same size, dimensions and style of the specified newsrack"—furnishes neutral criteria to guide the Public Works Director's determination of what qualifies as an equivalent newsrack. The permissible modifications of the specified newsrack to accommodate tabloid-style newspapers in Sections 22–159(c)(5) and 22–164(a) do not eliminate these standards and, thereby, vest unbridled discretion in one government official. These modifications were introduced when the Ordinance was amended in 1992, presumably to allow publishers of tabloid newspapers more easily to comply with the requirements of the Ordinance rather than to subject them to the whims of licensing officials. Furthermore, the Ordinance provides procedural safeguards against arbitrary decisionmaking, such as the requirement in Section 22–159(f) that the Public Works Director must state the "specific cause" for denial of a certificate of compliance and the opportunity for appeals from certification denials and judicial review under Section 22–162.

Like many municipal regulations, the Coral Gables Ordinance allows City officials to exercise some discretion in determining an applicant's compliance with its various provisions. This amount of discretion, however, does not reach the level of "unbridled discretion" found in the licensing schemes invalidated in *Lakewood* and *Miami Herald.* Because we conclude that the "equivalent" language in the Ordinance does not operate as a prior restraint, we hold that the district court erred in enjoining the City from enforcing that portion of Section 22–164(a).

### D.

■ On cross-appeal, Gold Coast asserts that the district court erred by not enjoining

**1350**

the enforcement of the insurance requirement of Section 22–160. Gold Coast argues that the City discriminates against newspapers by exempting religious and charitable organizations from licensing provisions and by not requiring insurance from owners of other vending machines. The district court concluded that Gold Coast did not make an adequate showing of disparate treatment. *Gold Coast,* 798 F.Supp. at 1572. The exemption from occupational licensing requirements for religious and charitable organizations, as well as the insurance requirements for vending machines, are located in a separate, and unrelated, chapter of the Coral Gables Code, Chapter 13. The chapter containing the current version of the Newsrack Ordinance, Chapter 22, neither refers to Chapter 13 nor mentions the exemption or insurance requirements found therein. We agree with the district court that Gold Coast has not demonstrated any disparate treatment and, therefore, reject its claim on cross-appeal.

## IV.

Under either the standards for limitations on commercial speech or noncommercial speech, the uniform color and size of lettering provisions in the Coral Gables Newsrack Ordinance represent valid time, place, or manner restrictions, or otherwise reasonable restrictions on commercial speech, and do not violate Gold Coast's First Amendment rights. Similarly, the provision regarding "equivalent" newsracks does not operate as a prior restraint because it does not vest unbridled discretion in City officials. Consequently, we conclude that the district court erred in enjoining the enforcement of these provisions of the Ordinance. We agree, however, with the district court's holding that the insurance requirement is constitutional. Accordingly, we REVERSE the district court's grant of injunctive relief regarding the "equivalent" language of Section 22–164(a), the uniform color requirement of Section 22–164(b), and the limitation on the size of lettering in Section 22–164(c); we AFFIRM the district court's denial of injunctive relief regarding the remaining provisions of the Ordi-

nance, including the insurance requirement of Section 22–160.

IT IS SO ORDERED.