[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 04, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-14413

_____

D.C. Docket No. 96-01738-CV-RWS-1

ATLANTA JOURNAL AND CONSTITUTION,
USA TODAY, a division of Gannett Satellite
Information Network ("GANSAT"), Inc.,

Plaintiffs-Appellees,

NEW YORK TIMES COMPANY,
d.b.a. The New York Times,

Intervenor-Plaintiff,
Appellee,

versus

THE CITY OF ATLANTA DEPARTMENT
OF AVIATION, ANGELA GITTENS, in her
official capacity as Aviation General Manager,
City of Atlanta, STEVE BAKER, in his official
capacity as Aviation Deputy General Manager,
City of Atlanta, SHIRLEY FRANKLIN, in
her official capacity as Mayor, City of Atlanta,

Defendants-Appellants.

—————————————————

No. 00-15181

—————————————————

D.C. Docket No. 96-01738-CV-RWS-1

ATLANTA JOURNAL AND CONSTITUTION,
USA TODAY,

Plaintiffs-Appellees,

NEW YORK TIMES COMPANY,
d.b.a. The New York Times,

Intervenor-Plaintiff,
Appellee,

versus

THE CITY OF ATLANTA DEPARTMENT
OF AVIATION, ANGELA GITTENS, in her
official capacity as Aviation General Manager,
City of Atlanta, STEVE BAKER, in his official
capacity as Aviation Deputy General Manager,
City of Atlanta, SHIRLEY FRANKLIN, in
her official capacity as Mayor, City of Atlanta,

Defendants-Appellants.

—————————————————

No. 00-15185

—————————————————

D.C. Docket No. 96-01847-CV-RWS-1

2

USA TODAY, a division of Gannett Satellite
Information Network ("GANSAT"), Inc.,

> Plaintiff-Appellee,

NEW YORK TIMES COMPANY,
d.b.a. The New York Times,

> Intervenor-Plaintiff,
> Appellee,

> versus

THE CITY OF ATLANTA DEPARTMENT
OF AVIATION, ANGELA GITTENS, in her
official capacity as Aviation General Manager,
City of Atlanta, STEVE BAKER, in his official
capacity as Aviation Deputy General Manager,
City of Atlanta, SHIRLEY FRANKLIN, in
her official capacity as Mayor, City of Atlanta,

> Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

**(January 4, 2002)**

Before BLACK, HILL and STAPLETON*, Circuit Judges.

_____
*Honorable Walter K. Stapleton, U.S. Circuit Judge for the Third Circuit, sitting by designation.

HILL, Circuit Judge:

In 1996, the City of Atlanta, through its Department of Aviation, implemented a new plan regulating news racks at Hartsfield Atlanta International Airport. The Atlanta Journal and Constitution, later joined by the New York Times and USA Today, brought this action seeking a declaration that the plan unconstitutionally deprived it of its rights under the First Amendment and an injunction against enforcement of the plan. In July of 2000, upon consideration of cross-motions for summary judgment, the district court declared the plan unconstitutional and issued a permanent injunction barring the City of Atlanta and the Department of Aviation from enforcing it. This appeal followed.

## I.

Hartsfield Atlanta International Airport is one of the nation's busiest airports. Nearly 64 million passengers travel through the City of Atlanta's (the "City") airport each year. An additional 15 million people visit the airport annually when accompanying departing passengers or greeting those who arrive. Some 35,000 to 45,000 people work at the airport. The airport consists of a main passenger terminal and six concourses, along which a variety of vendors offer their goods and services. News racks, owned by the Atlanta Journal and Constitution (the "AJC") as well as other newspapers, were operated by them as concessions.

In 1995 and 1996, the airport underwent a major renovation. Along with the renovation, the airport intensified its efforts to operate as more of a business entity. The City delegated to the Department of Aviation (the "Department") authority over the news racks.

As the 1996 Olympics approached, city officials developed a partnership with the Coca-Cola Company ("Coca-Cola") whereby the city would receive a subsidy for its arts programs in exchange for allowing Coca-Cola to maintain a commercial display area in the airport's atrium and to occupy prime retail space in that area without going though the usual bidding process. In looking for more ways to promote Coca-Cola and its downtown "Olympic City" commercial attraction, the City and Coca-Cola agreed that news racks in the airport would bear Coca-Cola advertising. Representatives of Coca-Cola selected twelve locations for the sixty-four news racks.

In April of 1996, the Department announced it was formulating a plan to replace privately-owned racks in the terminal with city-owned news racks and that this new plan would go into effect on July 1, 1996. The City's 1996 plan had four essential parts. First, the City would own the new racks. Second, the news racks were part of an airport promotion in conjunction with the 1996 Olympic Games and Coca-Cola was to play a major role in the Olympic promotion. Accordingly,

5

the new racks were to display advertisements for Coca-Cola. The plan prohibited the publishers of newspapers to display their own logos or advertisements on the news racks. Third, publishers selected to use the city-owned news racks were required to pay a $20 per month charge. Finally, the Department's decision to grant a permit for a publisher to use a news rack would be based on its "desire" to have a diversity of viewpoints in the airport; the Department could cancel a permit on thirty days notice without cause.

It is undisputed that the City conducted no study of news rack sales nor any issue relating to safety, security, aesthetics, passenger flow or any other justification for the plan. It is also undisputed that the selection of the news racks and their locations and numbers was delegated to Coca-Cola.

On July 5, 1996, the AJC installed its own news racks in the atrium and vestibule areas of the newly-renovated airport terminal. The Department confiscated the racks, citing the AJC's failure to secure a permit and claiming the positioning of the racks might constitute a fire code violation.

On July 9, 1996, AJC filed this action and moved for a temporary restraining order and a preliminary injunction. Following a hearing the next day, the district court entered a preliminary injunction prohibiting the City from enforcing its news rack leasing program.

On July 11, 1996, AJC again placed news racks at the airport. Department officials, however, again removed the racks, after the AJC refused to sign a permit. AJC returned to the district court, which amended its previous order by enjoining the Department from removing the news racks. The court also ordered that the method of news rack distribution in place prior to the City's enactment of the new distribution plan was to remain in effect for the duration of the preliminary injunction.

The Department then took the position that placement of news racks on airline concourses depended on securing permission from the relevant airline. After AJC secured permission from Delta Airlines to place its racks on their concourses, the Department revoked AJC's security clearance and required that it have a security escort to deliver papers to its news racks on the Delta concourses. In an emergency hearing, the district court ordered the Department to permit AJC to deliver its papers. After the Department continued to require the publishers to be escorted, the district court, in yet another emergency hearing, told the Department that it was coming "perilously close to criminal contempt." After some final skirmishing, the Department ceased its efforts to prevent AJC from distributing its papers on its own racks and, since that time, AJC has continued to sell their papers through their own news racks. The other two plaintiffs, USA

Today and The New York Times Company (all three, collectively, the "publishers"), subsequently joined this lawsuit.

In its order of July 2000, the district court granted summary judgment to the publishers, holding that the plan was constitutionally defective in at least three respects, and permanently enjoining its enforcement.

We review the district court's grant of summary judgment and application of the law *de novo*. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). We review the grant of a permanent injunction for an abuse of discretion. *Wesch v. Folsom*, 6 F.3d 1465, 1469 (11th Cir. 1993).

## II.

"It is well settled that the right to distribute newspapers through news racks is protected under the First Amendment." *Gold Coast Publications, Inc. v. Corrigan*, 42 F.3d 1336, 1343 (11th Cir. 1994). The government may, however, limit that right in a non-public forum, such as an airport. *International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992); *ISKCON Miami, Inc. v. Metropolitan Dade County*, 147 F.3d 1282, 1286 (11th Cir. 1998).

In a non-public forum, restrictions on speech are permissible so long as they are viewpoint-neutral and reasonable. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983). "The reasonableness of the Government's

restriction of access to a non-public forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 809 (1985). When the government chooses to restrict speech, its actions cannot be "arbitrary, capricious or invidious," *United States v. Kokinda*, 497 U.S. 720, 725-26 (1990), and it bears the burden of proving that they are not. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 120 S. Ct. 1878, 1881 (2000).

The district court held that the Department's plan violates the First Amendment because it impermissibly (1) discriminates between speech based upon viewpoint and content; (2) imposes a fee unrelated to administrative costs on a protected expressive activity – the sale of news papers through news racks; and (3) vests unbridled discretion, and therefore broad censorial power, in the administrators of the plan. We agree.

1.     __Use of News racks Bearing Coca-Cola Advertisements__[1]

---

[1] We agree with the publishers that this issue is not mooted because the Olympics are over. The City has never officially withdrawn any aspect of the 1996 plan, never represented that it has abandoned this aspect of the plan, nor conceded that it unconstitutionally compelled speech. The City may not "moot" an issue by making promises in legal briefs that it has ceased the activity in question, particularly when it continues to maintain the restriction is constitutional. *See Jager v. Douglas County Sch. Dist.*, 862 F.2d 824, 833-34 (11th Cir. 1989) (voluntary cessation of conduct does not "moot" issue of constitutionality of that conduct).

The Department's plan limits the kind of speech it will tolerate on airport news racks. Under the plan, a publisher wishing to sell newspapers on news racks in the airport is required to lease government-owned news racks, all of which carry advertisements for Coca-Cola . No other logo or advertising is permitted. The district court held that this requirement impermissibly burdens a protected expressive activity – selling newspapers. First, it compels some speech – the publishers must sell their papers on racks which endorse Coca-Cola. Second, the requirement discriminates among the viewpoints of potential speakers, by permitting some and prohibiting others.

Even if it is constitutional for government to ban advertisements on its news racks completely, once it permits some commercial speech to be exhibited there, its prohibition of all other commercial speech "raises the danger of content and viewpoint censorship." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 751 (1988). Even in a non-public forum, viewpoint discrimination is impermissible, *Lee*, 505 U.S. at 679, and, although "government may draw distinctions based upon content in order to preserve government property for its intended uses," *ISKCON Miami, Inc.*, 147 F.3d at 1288 n.5, the district court held that there was no principled reason based upon the purpose of the airport to justify distinguishing between commercial speakers on the City's news racks. The City's

desire to foster its relationship with Coca-Cola was insufficiently compelling to permit it to require the publishers to associate their publications with Coca-Cola products and to prohibit them from displaying their own logos or advertisements. We find no error in this conclusion.

2.    **The Licensing Fee**

The Department's 1996 plan imposes a $20 per month fee for the use of each news rack.  The publishers contend that the fee is illegal since it has long been established that government may not profit by imposing licensing or permit fees on the exercise of First Amendment rights.  *See Murdoch v. Pennsylvania*, 319 U.S. 105 (1943); *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941).  While a fee to defray the administrative costs of a licensing scheme is permissible, government is prohibited from using such a fee to raise revenue under the guise of defraying administrative costs.  *Id.*

The Department contends, however, that it should be allowed to charge a revenue-raising licensing fee, even on a protected activity, if it is acting in a "proprietary," as opposed to a "governmental," capacity.  The Department relies upon *Gannett Satellite Information Network, Inc. v. Metropolitan Transp. Authority*, 745 F.2d 767 (2d Cir. 1984).  In that case, the Second Circuit approved

11

a revenue-generating fee on news racks in the Metropolitan Transport Authority's

(the "MTA") subway stations in New York, holding that:

> Ordinarily, a government cannot profit by imposing licensing or
> permit fees on the exercise of a Fist Amendment right. Only fees that
> cover the administrative costs of the permit or license are permissible.
> In those cases in which licensing fees were prohibited, however, the
> government was acting in a governmental capacity and was raising
> general revenue under the guise of defraying its administrative costs.

*Id.* at 774 (citation omitted). Distinguishing "governmental" from "proprietary"

capacity, the Second Circuit held that as the operator of a commuter rail business,

the MTA was entitled to impose a revenue-raising licensing fee on concessionaires,

even those engaging in a protected expressive activity – the selling of newspapers.

According to the court, when government acts in this proprietary capacity, its

licensing fees are "permissible manner restrictions which serve the significant

governmental interest of raising revenue for the self-sufficient, efficient operation

of commuter lines." *Id.* at 775; *see also Jacobson v. City of Rapid City, S. D.*, 128

F.3d 660 (8th Cir. 1997) (city acted in proprietary capacity, thus was justified in

banning private news racks from airport based on its legitimate interest in

generating revenue). The City urged the district court to adopt this distinction and

permit it, as proprietor of the airport, to charge a revenue-raising fee for the use of

its news racks.

12

The district court, however, rejected this distinction because it appears to be foreclosed by the law of this circuit. In *Sentinel Communications Co. v. Watts*, 936 F.2d 1189 (11th Cir. 1991), we were called upon to decide, upon very similar facts, whether a revenue-generating licensing fee on protected expressive activity was constitutional. The case involved a challenge to a Florida scheme to regulate news racks in its highway rest areas. As a condition on placing news racks in the rest areas, publishers were required to agree to pay a five cent "administrative" fee for each paper sold. The district court had held that the fee was a "valid and reasonable contractual condition[ ] on Sentinel's placement of its news racks at the rest area." *Id.* at 1205.

We disagreed, holding:

First, it is well established that a licensing fee is permissible, but a state or municipality may charge no more than the amount needed to cover administrative costs. The government may not profit by imposing licensing or permit fees on the exercise of first amendment rights, and is prohibited from raising revenue under the guise of defraying its administrative costs.

*Id.*

In *Sentinel*, the state of Florida undertook to build state-run gift shops in its rest areas. While the facilitation of highway travel is the primary purpose of these rest areas, Florida clearly had an interest in generating revenue from sales at these

13

gift shops. Commercial activity benefitting the state became a secondary intended purpose of the rest areas, and Florida made an effort to maximize its revenues by charging publishers for the privilege of selling their newspapers in the gift shops. Even though these fees were imposed at a non-public forum with a significant commercial purpose, at which the government – as proprietor of the rest area and gift shops –  clearly sought to raise money to offset the cost of running the facility, we held that they were unconstitutional if they were unrelated to the costs of administering the licensing scheme. *Id.*

We find the facts of this case indistinguishable from those in *Sentinel*. Like the state of Florida, the Department  operates a non-public forum – the airport – which is designed to facilitate travel. A clear secondary purpose of the airport, however, is commercial activity, much of which is designed to benefit the City and the  Department by offsetting the costs of running the airport. The district court found, and we agree, that the news rack fees, as in Florida, were imposed without regard to administrative cost,[2] and were for the purpose of raising revenue. The facts being indistinguishable, the rule of *Sentinel* appears to preclude the City from

---

[2]The Department argues that it did introduce such evidence when it put in evidence of the prices the papers pay to have their products in shops and the rates it charges for retail space. The district court held this was evidence of the costs of doing business, not the costs of administering a licensing scheme. We find no error in this conclusion.

charging the publishers a revenue-raising fee for engaging in the expressive activity of selling newspapers.

The City seeks to distinguish *Sentinel*, contending that it does not apply. The City argues that *Sentinel* does not foreclose a "proprietary" capacity defense for the news rack fee since this distinction was not specifically addressed and rejected there. While we agree that *Sentinel* does not address the "proprietary" capacity defense for such fees, the Department's argument that it does not foreclose that defense here runs afoul of our decision in *Smith v. GTE Corp.*, 236 F.3d 1292 (11th Cir. 2001).

In *Smith*, we held that "the mere act of proffering additional reasons not expressly considered previously . . . will not open the door to consideration of the question by a second panel." *Id.* at 1302-03 (quoting *United States v. Bascaro*, 742 F.2d 1335, 1343 (11th Cir. 1984)). This is exactly what the City seeks to do here. It advances an additional reason – not considered by us in *Sentinel* – in support of its position that a revenue-raising licensing fee on protected expressive activity can be constitutional. The City proffers the additional reason that a revenue-rasing licensing scheme does not offend the Constitution if it is imposed by government acting in a proprietary, as opposed to governmental, capacity.

15

Were we writing on a clean slate we might well be persuaded of the merits of the governmental versus proprietary distinction advanced by the Department and adopted in at least two other circuits. Under *Smith*, however, we are foreclosed from reconsidering the holding of *Sentinel* for this new reason. Even though we did not expressly reject a "proprietary" capacity distinction in *Sentinel*, we held there that government may not raise revenue through a licensing fee on protected expressive activity. 936 F.2d at 1205. Only this court sitting *en banc*, can reconsider this holding.[3] Perhaps this will occur. For now, however, the fee imposed by the Department's 1996 plan is unconstitutional and may not be enforced.

### 3)   **Unbridled Discretion**

Finally, the Department's plan also grants unbridled discretion to airport personnel to  choose which publications are granted access to the city-owned news racks, and to cancel a publisher's news rack  license at will. The only guidance offered to the officials administering the plan is the "desire of the Department of Aviation to present a diversity of publications in a coherent manner." It is clear that this "desire" not only permits, but in fact compels, the official to discriminate

---

[3]*Sentinel*, read with *Smith*, produces a situation where our court's first consideration of an issue might well be by the court sitting *en banc*; although not argued by the parties nor, therefore, reached by the court, the governmental versus proprietary distinction was subsumed by the holding of *Sentinel*, and cannot, under *Smith*, be "resurrected" by our panel.

among viewpoints based specifically upon the viewpoint itself. The district court held that this kind of discretion is facially unconstitutional and we agree.

Once again, *Sentinel* controls. There we explained that:

> A court may invalidate an excessively broad grant of discretion on its face, without regard to the particular facts of the plaintiff's case, because the very existence of the discretion lodged in the public official is constitutionally unacceptable. By facially invalidating broad grants of discretion, the Supreme Court has revealed that the problem [with such discretion] is not potential abuses, but the very existence of broad censorial power.

936 F.2d at 1197.

The Supreme Court has invalidated similar city ordinances which vested broad discretion in its personnel to control expressive activity. *Lakewood*, 486 U.S. at 769. In *Lakewood*, the Court invalidated an ordinance which gave the mayor the authority to deny applications for permits to place news racks on public property. In striking down the ordinance, the Court noted that "the face of the ordinance itself contains no explicit limits on the mayor's discretion." *Id.*

Similarly, the Department's plan contains no explicit limits on airport personnel's power to cancel news rack licenses. On its face, the plan permits the Department to cancel a publisher's license for any reason whatsoever, including unconstitutional reasons such as viewpoint discrimination. Such unbridled discretion vests broad censorial power in government and this the Constitution

17

does not permit.  *Id.*;  *Sentinel*, 296 F.2d at 1197.  We find no error in the district court's conclusion that this aspect of the City's 1996 plan is unconstitutional and may not be enforced.

### III.

The Department's plan impermissibly compels some speech, prohibits other speech based upon its viewpoint, imposes a revenue-raising fee on protected speech, and vests in government an unfettered discretion to discriminate among speech based upon viewpoint and content.  The district court correctly held that this plan violates the Constitution.   The grant of a permanent injunction prohibiting the City and the Department from enforcing this unconstitutional plan, therefore, was not an abuse of discretion.  Accordingly, the judgment of the district court is

AFFIRMED.